639 F.2d 972
 Dorothy HOOTS, individually and as mother of her children
Janelle Hoots and Jamie Hoots; Mrs. Addrallace Knight,
individually and as mother and natural guardian of her
children Ronald Knight, Loretta Knight, Terrance Knight,
Marc Knight and Byron Knight; Barbara Smith, individually
and as mother and natural guardian of her children Tawanda
Smith, Tevela Smith, Joseph Smith, Wesley Smith and Eric
Smith; on behalf of themselves and all others similarly
situated, Appellants,
v.
COMMONWEALTH OF PENNSYLVANIA; Edward X. Hallenberg,
President of the Allegheny County Board of School Directors;
The Allegheny County Board of School Directors; W. Deming
Lewis, Chairman of the Pennsylvania State Board of
Education; The Pennsylvania State Board of Education;
Michael Sullivan, President of the School District of the
Borough of Braddock; The School District of the Borough of
Braddock; Andrew Lisyak, President of the School Board of
the School District of the Borough of Rankin; The School
District of the Borough of Rankin; Leo Campbell, President
of the School Board of the School District of the Borough of
North Braddock; and The School District of the Borough of
North Braddock; The Allegheny Intermediate Unit Board of
School Directors and Edward X. Hallenberg, as President of
the Allegheny Intermediate Board of School Directors, Appellees.
 No. 80-2116.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 3, 1980.
Decided Jan. 26, 1981.
Opinion on Denial of Rehearing Feb. 25, 1981.
As Amended Feb. 26, 1981.
 
 James S. Liebman (argued), Bill Lann Lee, Jack Greenberg, Thomas J. Henderson, Neighborhood Legal Services Ass'n, New York City, for appellants.
 Allen C. Warshaw (argued), Alton Arnold, Harvey Bartle, III, Harrisburg, Pa., for Commonwealth of Pennsylvania.
 J. Robert Maxwell (argued), Maxwell & Huss, Pittsburgh, Pa., for Churchill Area School Dist.
 John J. Hickton (argued), James R. Duffy, Hickton & Dean, Pittsburgh, Pa., for Swisvale Area School Dist.
 G. N. Evashavik (argued), Evashavik, Capone, Evans & Della Vecchia, Pittsburgh, Pa., for Turtle Creek Area School Dist.
 Carl W. Brueck, Jr., Brueck & Houck, Pittsburgh, Pa., for Edgewood School Dist.
 J. Frank McKenna, III and William M. Wycoff, Thorp, Reed & Armstrong, Pittsburgh, Pa., for East Allegheny School Dist.
 Donald C. Fetzko, Pittsburgh, Pa., for Steel Valley School Dist.
 Before HUNTER, GARTH and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge.
 
 
 1
 This is the fifth published chapter in the long history of this litigation.[1] The factual history and procedural posture of the case were ably recited by Judge Garth in this court's October, 1978 opinion.[2] Here, we will briefly summarize that account and then supplement it with a recital of subsequent events leading to the instant appeal.
 
 I.
 
 2
 Plaintiffs, mothers of children who attend public schools in the General Braddock Area School District ("GBASD") in Allegheny County, Pennsylvania, filed a complaint on June 9, 1971, alleging that the consolidation of various school districts in that county had resulted in the creation of racially segregated schools.[3] The district court, in an opinion and order filed on May 15, 1973, held that the creation of the GBASD by the Pennsylvania State Board of Education and the Allegheny Intermediate Unit Board of School Directors was "an act of de jure discrimination in violation of the Fourteenth Amendment."[4] Defendants were given forty-five days to prepare and submit a comprehensive plan for school desegregation in the central part of eastern Allegheny County.[5]
 
 
 3
 In September, 1973, defendants filed Plan "22-W" with the district court. The most prominent feature of the Plan was the consolidation of seven adjacent school districts, including GBASD, into two. The school districts affected by "22-W" were permitted to intervene to offer evidence on the Plan. In an order and memorandum opinion filed on May 7, 1975, the district court rejected Plan 22-W.[6] Defendants were ordered to submit another plan.
 
 
 4
 In September, 1975, the Commonwealth submitted a new plan, "Plan A," providing for the consolidation of General Braddock with neighboring school districts. On November 18, 1977, the district court denied the Commonwealth's motion for approval of Plan A even though it observed that the Plan involved a "more moderate realignment" of school boundaries than earlier plans.[7] The memorandum and order denying approval of the Plan also denied "any necessary injunctive order to implement such plan ... without prejudice to the right of any party to submit further plans or proposal in support thereof."[8]
 
 
 5
 Plaintiffs appealed the district court's order withholding approval of Plan A to this court. We dismissed that appeal for want of appellate jurisdiction, noting that the district court's order was "neither a final order nor an appealable interlocutory order which can vest this Court with appellate jurisdiction." Hoots IV, 587 F.2d at 1342. In dismissing the appeal, however, we anticipated the speedy resolution of the dispute and the implementation of appropriate relief by the district court:
 
 
 6
 We are confident that, in light of the long history of this litigation and the sensitive, constitutional nature of the relief sought, the district court will require submission of a plan forthwith and certainly within the time limits of its original order, will expedite all further proceedings, and will give priority on its calendar to consideration and implementation of the plan. This being so, it would appear that an appropriate final order can be entered by year end which will grant plaintiffs the relief to which they are entitled under the district court's order of May 15, 1973.
 
 
 7
 587 F.2d at 1351. (footnote omitted).
 
 
 8
 Following the dismissal of the appeal, appellants, on January 25, 1979, asked the district court to order the Commonwealth to submit within forty-five days a desegregation plan that was "interdistrict in character" involving either a redistricting of GBSAD, or "the tuitioning of current school-age students in General Braddock Area School District to appropriate surrounding school districts ....," or both. Appendix for Appellants at 235a.
 
 
 9
 On February 6, 1979, the district court held a status conference at which "a wide range of possible remedies (was) discussed and "argued," including district consolidation, the tuition plan and a newly proposed "upgrade" plan for the internal improvement of the quality of GBASD's schools. Application for Writ of Mandamus, Hoots v. Weber, No. 79-1474, at 7-8, reprinted in Appendix for Appellants at 243a-244a. No order was issued by the district court at the conference.
 
 
 10
 On April 16, 1979, plaintiffs filed an application for Writ of Mandamus requesting this court to order the district court to "direct the state defendants to submit another interdistrict plan which would involve the use of tuition as a technique to remedy the problem presented by C.A. No. 71-538." Application for Writ of Mandamus, Hoots v. Weber, No. 791474, at 2 reprinted in Appendix for Appellants at 23a. We denied the application on May 2, 1979, "(i)n view of the answer of Chief Judge Weber, and specifically his statement that he plans to proceed promptly." Hoots v. Weber, No. 79-1474 (3d Cir. May 2, 1979), reprinted in Appendix for Appellants at 312a.
 
 
 11
 On May 17, 1979 the district court entered two orders: 1) it directed the Commonwealth to prepare and file a tuition voucher plan by August 15, 1979 for grades 7-12, or 10-12;[9] and 2) it added eight school districts as parties solely for the remedial phase of the case.[10] The newly joined school districts then filed motions to dismiss; and in response to that motion the court on June 12, 1979 ordered plaintiffs to brief the Milliken v. Bradley question of whether the named school districts could be included in a remedial plan.[11]
 
 
 12
 The Commonwealth filed a proposed tuition plan and moved for its approval on September 10, 1979.[12] After a hearing on November 17, 1979, the district court denied the motion and orally ordered the Commonwealth to prepare a more detailed plan.
 
 
 13
 The Commonwealth filed its more detailed tuition plan on May 15, 1980 ("The Tuition Plan"). The plan provided that: 1) all the GBASD students in grades 7-12 would be transferred to eight surrounding school districts; 2) all the GBASD secondary schools would be closed; 3) all the students would be able to choose their new schools, subject to limitations on the number of students that would be assigned to each school district; 4) GBASD would pay the tuition of all of the transferred students on the basis of the average cost of educating a student in the receiving district; 5) only the GBASD students would be transported; and 6) there would be no transfer of elementary school students.[13]
 
 
 14
 On May 22, 1980, the Commonwealth submitted a second plan, "a Metropolitan Desegregation Plan for General Braddock Area School District" ("The Metropolitan Plan"). Reprinted in Appendix for Appellants at 486a-516a. This plan called for the consolidation of GBASD with three surrounding school districts: Edgewood, Swissvale and Turtle Creek.[14]
 
 
 15
 On June 6, 1980, GBASD filed its "upgrade plan." This plan provided for an intradistrict remedy: GBASD would improve the quality of its schools' programs and facilities in order to attract parochial school students back to the public schools. Reprinted in Appendix for Appellants at 475a-485a.
 
 
 16
 The district court ordered all parties to file their objections to the various plans by June 16, 1980. Appellants argued for the rejection of the Tuition Plan because of its exclusion of elementary school pupils. All but one of the school districts not included in the Metropolitan Plan argued for its adoption and for the rejection of the Tuition Plan. All of the school districts supported the upgrade plan; appellants opposed it.
 
 
 17
 On July 14, 1980, hearings commenced on the Tuition Plan.[15] The Commonwealth offered evidence supporting the Plan, arguing that it would offer a non-segregated education for all children in grades 7-12. The Commonwealth admitted that the plan did not address the elementary school grades, but expressed its willingness to consider modifications to the plan.[16] The Commonwealth rested on July 17, 1980. At the conclusion of the Commonwealth's case, plaintiffs (along with defendants East Allegheny, GBASD, Steel Valley, and West Mifflin school districts) orally moved for the rejection of the Tuition Plan. The motion was denied. Appendix for Appellants at 529a.
 
 
 18
 Plaintiffs then presented testimony critical of the Tuition Plan. The testimony centered on the inadequacy of the relief insofar as it did not provide for the desegregation of grades K-6. Plaintiffs' witnesses were critical of the plan's allocation of GBASD students among eight, rather than fewer, school districts. Plaintiffs also objected to shifting the entire burden of relief to GBASD.
 
 
 19
 On July 24, 1980 plaintiffs filed a written motion to reject the Tuition Plan and for an injunction setting a timetable to implement interdistrict relief beginning in the fall of 1980. On July 28, 1980, the district court orally denied the motion. Appendix for Appellants at 556a-560a. The plaintiffs then continued their presentation of evidence, which was not only critical of the Tuition Plan, but also urged the adoption of consolidation relief similar to the Metropolitan Plan.
 
 
 20
 On July 30, 1980, at the close of their case, plaintiffs once again filed a written motion asking the district court to reject the Tuition Plan and to grant an injunction providing for immediate relief in the form of a merger or consolidation plan, and for the imposition by the court of a timetable to implement such a plan beginning in mid-school year 1980-81. The district court denied the motion without prejudice.[17]
 
 
 21
 On August 4, 1980 plaintiffs filed a notice of appeal from the district court's July 28 (oral) and July 30 (written) orders denying injunctive relief. An application for a writ of mandamus was filed on August 11, 1980. We granted plaintiffs' motion for expedited appeal on August 14, 1980. Hoots v. Commonwealth of Pennsylvania, No. 80-2116 (3d Cir. August 14, 1980). Subsequently, we denied the application for mandamus on September 9, 1980. Hoots v. Weber, No. 80-2124 (3d Cir. September 9, 1980).
 
 
 22
 Following the notice of appeal, the district court continued to take testimony on the Tuition Plan. At the conclusion of hearings on August 22, 1980, the district court requested briefing on two issues: 1) which school districts could be included, consistent with Milliken v. Bradley, in a remedial plan; and 2) whether the Tuition Plan, as a matter of law, failed to correct the constitutional violation. The court scheduled arguments on these issues for October 2, 1980, and noted that their resolution would determine the possibility of future hearings on either merger or upgrade plans.
 
 
 23
 Oral argument was held before this court on November 3, 1980. Subsequently, on November 20, 1980 we granted appellants' motion that the record be supplemented with all documents and transcripts of testimony and argument filed in the district court after July 30, 1980. We filed a second order to supplement the record on December 4, 1980.
 
 
 24
 The supplemented record reveals that on November 13, 1980 Judge Weber stated that he would schedule no further proceedings until this court ruled on the instant appeal. Further, he ordered that disposition of the matters briefed and argued on October 2, 1980 be stayed pending appeal.
 
 II.
 
 25
 The threshold question in this appeal is that of appellate jurisdiction. Appellants assert that Judge Weber's July 30, 1980 order is either final within the meaning of 28 U.S.C. § 1291 (1976),[18] or that the order comes within the class of appealable injunctive orders under 28 U.S.C. § 1292(a)(1) (1976).[19] The Commonwealth appellees "concede" jurisdiction under section 1292(a)(1) but challenge our jurisdiction under section 1291. Several school district appellees contest jurisdiction on either basis.
 
 
 26
 It is the duty of this court to examine its jurisdiction in every case, Mansfield, Coldwater & Lake Michigan Railway Company v. Swan, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884); United States ex rel. Esola v. Groomes, 520 F.2d 830, 834 n.16 (3d Cir. 1975), notwithstanding any agreement among the litigants that such jurisdiction exists. United States v. Cities Service Company, 410 F.2d 662, 663 (1st Cir. 1969). Accordingly, we must examine the text of Judge Weber's July 30, 1980 order to see if it is appealable under either section 1291 or section 1292(a).
 
 
 27
 Appellants premise their claim of section 1291 jurisdiction, as they did in Hoots IV, on the Sixth Circuit's decision in Kelley v. Metropolitan Board of Education, 436 F.2d 856 (6th Cir. 1970).[20] We once again find this argument unpersuasive, and find that the district court's July 30 order was not a final decision within the meaning of section 1291. This circuit has consistently given a narrow definition to the class of final orders that are appealable. Hoots IV, 587 F.2d at 1347; Bachowski v. Usery, 545 F.2d 363, 373-74 (3d Cir. 1976). The July 30 order does not fall within this narrow class, and hence is not appealable under section 1291. A contrary finding would substantially erode the purpose of the final order doctrine. Bachowski, 545 F.2d at 373. See Hoots IV, 587 F.2d at 1346-48.
 
 
 28
 Appellants argue, in the alternative, that the July 30, 1980 order is appealable as a denial of an injunction under 28 U.S.C. § 1292(a)(1) (1976). They claim that the district court's denial of an injunction that would have afforded them merger or consolidation relief falls within the class of appealable interlocutory orders under section 1292(a)(1).
 
 
 29
 The July 30 order, on its face, denied injunctive relief to appellants. We have observed, however, that "literal characterization of an order as an injunction only begins the inquiry into appealability." Stateside Machinery Company, Ltd. v. Alperin, 526 F.2d 480, 482 (3d Cir. 1975); Rodgers v. United States Steel Corporation, 541 F.2d 365, 372 (3d Cir. 1976). We must look beyond the text of the order and read it in the context of the history and purpose of section 1292(a)(1). See Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 180-81, 75 S.Ct. 249, 251-52, 99 L.Ed. 233 (1955); Stewart-Warner Corporation v. Westinghouse Electric Corporation, 325 F.2d 822, 829-30 (2d Cir. 1963) (Friendly, J. dissenting), cert. denied 376 U.S. 944, 184 S.Ct. 800, 11 L.Ed.2d 767 (1964). Appealability of interlocutory orders under section 1292(a)(1) developed because of a "need to permit litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence." Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 480, 98 S.Ct. 2451, 2453, 57 L.Ed.2d 364 (1978), quoting Baltimore Contractors, 348 U.S. at 181, 75 S.Ct. at 252.
 
 
 30
 We find that the July 30, 1980 order denying injunctive relief to appellants effective in the fall of 1980 was an interlocutory order of "serious, perhaps irreparable consequences" that vests this court with appellate jurisdiction under 28 U.S.C. § 1292(a)(1) (1976).[21] The district court denied the relief requested by appellants, and the denial had serious, if not irreparable consequences for GBASD school children who will now have to wait another year before enrolling in racially integrated schools. Although the trial court denied the motion for an injunction "without prejudice,"[22] the effect of the denial was to preclude any possibility of granting the relief sought by appellants. Thus the July 30, 1980 order is distinguishable from the order appealed in Hoots IV which did not deny any "element of the relief sought by plaintiffs" and "did not seek any injunction." Hoots IV, 587 F.2d at 1348 n.42.[23]
 
 III.
 
 31
 Having decided that we have jurisdiction to review the district court's July 30, 1980 order, we begin our consideration of the merits by observing that our role as an appellate court is a limited one. As this court held in Evans v. Buchanan, 555 F.2d 373, 380 (3d Cir. 1977) (en banc), in school desegregation cases "(f)ormulating a realistic, practical, and effective remedy is a job peculiarly within the province of the trial court, whose position gives it a quantum advantage over an appellate court in weighing the 'practicalities of the situation.' " In litigation as long and complex as this, the fashioning of relief should normally "be entrusted in large measure to the sound discretion of the District Court Judge who has lived with (it) for so many years." Gilmore v. City of Montgomery, 417 U.S. 556, 577, 94 S.Ct. 2416, 2427, 41 L.Ed.2d 304 (1974) (Marshall, J. concurring).
 
 
 32
 Balanced against our deference to the trial court, however, is an affirmative obligation to ensure that de jure discrimination in public schools is remedied "forthwith." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 14-15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); See also Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970); Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Although the primary responsibility for remedying past discrimination rests with the school authorities, Green, 391 U.S. at 437-38, 88 S.Ct. at 1693-94, "in default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system." Swann, 402 U.S. at 16, 91 S.Ct. at 1276. See also Columbus Board of Education v. Penick, 443 U.S. 449, 458-61, 99 S.Ct. 2941, 2947-48, 61 L.Ed.2d 666 (1979). The district court "has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Green, 391 U.S. at 438 n.4, 88 S.Ct. 1694 n.4, quoting Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). See also United States v. DeSoto Parish School Board, 574 F.2d 804, 811 (5th Cir.) cert. denied, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978). ("If the school board defaults in its duty, the responsibility of the District Court is equally clear and compelling: to use its broad and flexible equitable powers to implement a remedy.")
 
 
 33
 Striking the required balance in this case, we conclude that the formulation of an appropriate remedy lies within the sound discretion of the district court. Accordingly, we decline to grant appellants' request that we require the implementation of merger or consolidation relief. We also decline, at this time, to reject the concept of a tuition plan for GBASD. The primary duty to choose between these competing remedial plans rests with the district court. Regardless of the particular plan chosen by the district court, the remedy must be broad enough to completely eradicate the de jure discrimination found by the trial court in Hoots II. See Anderson v. Dougherty County Board of Education, 609 F.2d 225, 226 (5th Cir. 1980).
 
 
 34
 Although we hold that the duty to fashion a remedy is charged to the district court, we are nonetheless obligated to ensure that relief be implemented as promptly and as practicably as possible. Once before, we expressed our confidence that the parties would assist the trial court in reaching a speedy resolution of the remedial phase of this protracted case. But the vagaries of litigation, including a change in appellant's counsel and shifting litigation strategies and positions, have prevented this result. Accordingly, we are constrained to take affirmative steps to guarantee that relief will be implemented forthwith.
 
 
 35
 Our understanding of the posture of the case is that hearings have been completed on the Tuition Plan and that at least some testimony has been taken on the merits of consolidation or interdistrict relief.[24] The district court has taken briefs and heard arguments on the Milliken question, but has not yet ruled on which school districts can be included within an interdistrict remedial plan. On November 13, the district court suspended all further proceedings pending our decision.
 
 
 36
 We believe it to be essential that the district court afford relief to appellants that will be effective in the fall of 1981. Under no circumstances should a new school year begin in the fall of 1981 without an acceptable remedial plan in place.
 
 
 37
 Accordingly, we order the district court[25] to expedite its consideration of this case so that within ninety days[26] of the issuance of the mandate of this court it shall:
 
 
 38
 1) complete all hearings and necessary proceedings on the merits of the competing remedial plans for the desegregation of GBASD;
 
 
 39
 2) decide the Milliken v. Bradley issue of which school districts may be included within an interdistrict remedy; and
 
 
 40
 3) enter an appropriate final order granting appellants the relief to which they are entitled under the district court's order of May 15, 1973, such relief to be effective and implemented by the beginning of the first semester of the school year in the fall of 1981.
 
 
 41
 We are confident that with the cooperation of all parties, and with complete mobilization of the court's and the parties' efforts and resources in this compelling endeavor, this timetable may and will be achieved.
 
 IV.
 
 42
 Therefore, we vacate the July 30, 1980 order of district court and remand for proceedings consistent with this opinion. The mandate of this court shall issue forthwith.
 
 
 43
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge, concurring.
 
 
 44
 On June 9, 1971, Dorothy Hoots and other concerned parents of children attending public schools in the General Braddock Area School District (GBASD) in Allegheny County, Pennsylvania, filed a complaint challenging its racially segregated school system. On May 15, 1973, the district court held that the creation of the GBASD was "an act of de jure discrimination" in violation of the fourteenth amendment. Hoots v. Commonwealth of Pennsylvania, 359 F.Supp. 807, 823 (W.D.Pa.1973), (Hoots II ), appeal dismissed, 495 F.2d 1095 (3d Cir. 1974), cert. denied, 419 U.S. 884, 95 S.Ct. 150, 42 L.Ed.2d 124 (1974). Almost seven years have since elapsed without the district court ordering any remedy. There have been numerous appeals during this period attempting, without success, to expedite the implementation of an effective remedy. Judge Hunter has dealt with this problem of unconscionable delay in a thoughtful and moderate opinion which imposes quite reasonable time limitations. I join Judge Hunter in the result.[1]
 
 
 45
 I feel compelled to write separately, however, to emphasize my fundamental differences with the dissent of Judge Garth, who challenges the power and the wisdom of this court's imposing a 90-day timetable on the district court to choose a remedial plan. Despite the passage of 9 1/2 years since the filing of the original complaint, and the graduation of black students each year from a public school system held to be in violation of the United States Constitution, the dissent today claims that we are powerless to place any time limitations on the district court's consideration of possible remedial decrees. I find this view of the powerlessness of an appellate court contrary to judicial precedent and doctrine and a derogation of our judicial mandate to enforce the provisions of the Constitution. I know of no other judicial authority, and the dissent does not cite any, which has ever taken such a position. I reject it completely.
 
 I.
 
 46
 Judge Garth provides three reasons for refusing to impose a time limitation on the district court. First, he claims that an appellate court lacks the power under any circumstance to impose a timetable for decision on a district court judge. Second, he claims that even if we do possess such power, it is inadvisable as a matter of policy that we exercise it. He believes this is especially true in this case where, according to Judge Garth, the 9 1/2 year delay is not the responsibility of the district court judge. Finally, he claims that a 90-day requirement is too restrictive. I find his hypothetical and speculative arguments unpersuasive and divorced from the stark reality of this inexcusable 9 1/2 year delay.
 
 A.
 THE POWER TO IMPOSE A TIMETABLE
 
 47
 The dissent's contention that we lack the power to place time limitations on a district judge is contradicted by numerous federal decisions. Every court which has reached this issue has found that an appellate court possesses the power, in exceptional circumstances, to impose time limitations on the district court. In Anderson v. Dougherty County Bd. of Educ., 609 F.2d 225, 226 (5th Cir. 1980), the appellate court ordered "the district court to adopt a plan for the desegregation of the elementary and junior high schools in the Dougherty County School system within sixty days from the entry of (the appellate court's) order," and retained jurisdiction. The Fifth Circuit also imposed a mandatory timetable in the case of United States v. Texas Educ. Agency, No. 79-2833 (5th Cir. November 15, 1979) (per curiam). The dissent characterizes the Anderson decision as "improvident and improper," but cites no cases from the Fifth Circuit or any other circuit disapproving such a decree. At 994 n.8.
 
 
 48
 Indeed, numerous courts have gone even further and themselves drafted injunctions where the district court was unwilling or unable to act. For example, in United States v. Lynd, 301 F.2d 818 (5th Cir.), cert. denied, 371 U.S. 893, 83 S.Ct. 187, 9 L.Ed.2d 125 (1962), the Fifth Circuit employed extraordinary powers to remedy violations of voting rights by granting a temporary injunction at the Court of Appeals level. Judge Tuttle, writing for the court, ordered the injunction "transmitted forthwith to the Clerk of the District Court," bypassing completely a remand to the district court for fashioning an entry of the injunction. 301 F.2d at 823. See also United States v. Lynd, 349 F.2d 785 (5th Cir. 1965); Stell v. Savannah-Chatham County Bd. of Educ., 318 F.2d 425 (5th Cir. 1963). An even more compelling example of the power of the Court of Appeals was evidenced in United States v. Barnett, 330 F.2d 369 (5th Cir. 1963) (the James Meredith case), cert. denied, 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964), where the appellate court, sitting en banc, heard witnesses in open court and entered "its order, findings of fact and conclusions of law and judgment of civil contempt." 330 F.2d at 376. Although Chief Judge Weber's handling of the Hoots case is not comparable to the actions of the district court judges in Lynd and Barnett, these cases demonstrate the power and duty of the Court of Appeals to make real every citizen's fundamental civil rights.
 
 
 49
 The dissent does not challenge the power of the circuit court to take testimony and to fashion and enter its own injunctive decree, as in Lynd and Barnett. Rather, it claims that the exercise of such powers "obviously (has) nothing to do with a Court of Appeals order which commands that a district court deal with discretionary and evidentiary matters within a particular time frame." At 997. Yet the usurpation by the Court of Appeals of the district court's duty to hold evidentiary hearings and to fashion a remedy is a far greater intrusion on the lower court's discretion than a modest 90-day order. If the dissent does not challenge the power of the court to take these extraordinary actions, I fail to see how it can deny its power merely to place a time limitation on the district court's decision. It is precisely because we are unwilling to intrude upon the district court's discretion any further than is necessary that we have sent the case back for a final decision by Chief Judge Weber.
 
 B.
 
 50
 THE WISDOM OF PLACING TIME LIMITATIONS ON JUDGES
 
 
 51
 The dissent's second argument is that, even if we have the power to impose such a time limitation, it is "inadvisable" that we exercise it. Setting any timetable would be "unseemly, injudicious, improper and unrealistic" because it unduly limits the discretion of the district court judge and upsets him emotionally. The dissent is replete with scare words predicting doom for the federal judiciary if, after 9 1/2 years, the district court is ordered to resolve the case within an additional 3 months. It sees this order as carrying the "seeds of great mischief and potential disruption" and finds it "demeaning and even insulting" to the district court judge because it is "misconceived and misdirected" and implies "criticism" of the district judge. At 990-991. Judge Garth sees the majority's opinion as an implied threat to hold the district judge "in contempt," to subject him to "some form of disciplinary proceeding," to "remove his caseload," and finally, to "point a gun without the ability to pull its trigger." At 996.
 
 
 52
 I cannot find a basis for any responsible judge to be demeaned because a judgment is vacated and remanded to him in a 9 1/2 year case where the litigants have received no relief. Article III judges are, or should be, mature enough to recognize that remands are not "demeaning and even insulting." Speaking of the Supreme Court, Justice Robert Jackson once commented, "We are not final because we are infallible, but we are infallible only because we are final." Brown v. Allen, 344 U.S. 443, 540, 73 S.Ct. 397, 432, 97 L.Ed. 469 (1953) (Jackson, J., concurring). In my view, district court judges have a healthy skepticism of the infallability of all appellate courts. I do not believe that they will shirk from their duty and obligations when a "higher" court disagrees with them on the law. Hardly a week goes by without this court reversing a district judge. I have yet to find any district court judge who believes that a good faith reversal or remand is "pointing a gun" to the lower court judge's head.
 
 
 53
 Judge Garth stresses what he perceives as the "humiliation" of the district judge because of this 90-day order. Our court should have equal concern for the humiliation thrust upon innocent black children who for almost a decade have been begging for judicial relief from the persistent constitutional violation which Chief Judge Weber[2] found they endure, and of the humiliation when hundreds of black children have already graduated without ever having their constitutional rights enforced.
 
 
 54
 Nowhere is the dissent more misleading and deceptive than the "Ode" to district court judges. The dissent distorts the issue totally and measures the precious constitutional rights of children by impermissible standards. While I appreciate the fact, as Judge Garth notes, that he was a district court judge for three years, the judges of the majority are not bereft of state trial or district court experience. I am not hostile to district court judges and I will not debate the claim that district court judges are "the most diligent, conscientious and hard-working judicial cadres in this country." At 991. I recognize that Chief Judge Weber is an excellent judge; he is not malevolent, venal or incompetent. But despite my agreement with the dissent's accolades on the general excellence of district judges, I believe that Chief Judge Weber, like all of us, is not infallible. Far more important than back-patting rhetoric among the judicial fraternity as a mutual admiration society, the citizens of this nation are entitled to have their civil rights implemented promptly even if, in the words of the dissent, some district judges might "have resentment" of our views of the Constitution.
 
 
 55
 Judges and lawyers should never be shocked with time limitations to finish their obligations. This court's own Internal Operating Procedures (IOP's) are replete with time limitations on judges and the parties which can be more restrictive and demanding than the present 90-day order. We require that parties submit briefs four weeks before oral argument. IOP, Chapter I(A). We require that a judge write a dissent within 45 days of the circulation of the majority opinion. IOP, Chapter V(D). And we require that judges vote to rehear a case, or file a dissent to a denial of a petition for rehearing, within 8 days of the circulation of the petition for rehearing. IOP, Chapter IX(A)(3), (A)(6)(d).
 
 
 56
 The dissent's rejection of the time limitations is predicated on the view that we never could enforce such an order. Of course, all appellate decisions ultimately rest upon the willingness of district court judges to obey them, rather than any inherent power we have to physically enforce compliance. Time limitations are no more inherently unenforceable than any other type of order. If the power of this court to act were limited, as the dissent suggests, to those situations where we could physically force compliance on district court judges, then this court would be stripped of its purpose and function.
 
 
 57
 It is the responsibility of a district court judge to shape the movement of cases through his or her court. Once suit has been brought, he or she has a duty to meet this constitutional mandate. Yet nearly ten years have elapsed in this case since the suit was filed. The original plaintiffs, along with a generation of black students from Allegheny County, have already graduated from school and irretrievably lost the opportunity ever to receive a public school education which conforms with constitutional requirements. After the judge has struggled without success for almost ten years to meet this mandate, and we have recommended in a previous appeal of two years ago that the case be disposed of within six months, it would be a derogation of our function as an appellate court not to impose a requirement that the court act with dispatch.
 
 
 58
 Neither Chief Judge Weber nor district court judges in general are on trial here. The issue is whether black children who have waited patiently at the courthouse door for more than 9 1/2 years without an ounce of relief are entitled to a decree that their matter be expedited within a specific time frame. The rights of citizens are not contingent upon a Gallup poll survey as to whether a district judge or even the community in general is receptive to a constitutional mandate. If the Constitution required that appellate courts worry about "resentment on the part" of a district court judge or by the community, as Judge Garth suggests, at 991, then James Meredith would still be waiting in vain to enter the University of Mississippi, Autherine Lucy's application to the University of Alabama would still be in limbo, and thousands of blacks denied the right to vote in Forrest County, Mississippi would still be disenfranchised. See United States v. Barnett; Lucy v. Adams, 228 F.2d 619 (5th Cir.), cert. denied, 351 U.S. 931, 76 S.Ct. 790, 100 L.Ed. 1460 (1956); United States v. Lynd.[3]
 
 
 59
 Fortunately, neither the Court of Appeals for the Fifth Circuit nor any other federal appellate court in the nation has adopted the unconstitutional standard urged in the dissent.
 
 C.
 THE CAUSE OF THE DELAY
 
 60
 Judge Garth also contends that whatever the general merits of restricting the timetable of district court decisions, the facts of this case do not warrant such action. He suggests that the 9 1/2 year delay is due entirely to the actions of the plaintiffs, and therefore the district court should not be held accountable for the time delay.
 
 
 61
 The delay in this case is allegedly due to "two improvident appeals and the recent decision of the plaintiffs to change direction in midstream." At 991-992 (footnote omitted). A review of the factual circumstances under which the plaintiffs were forced to act reveals that the two appeals were taken in an effort to force the implementation of a remedy and not to delay the proceedings. Indeed, virtually every action by the plaintiffs has been in response to inaction by either the district court or the defendants.
 
 
 62
 The plaintiffs' first appeal[4] was taken to this court in 1977 after Chief Judge Weber issued his November 1977 Order denying Plan A. Plan A was a school district consolidation program first submitted to the Pennsylvania State Board of Education (State Board) in July of 1973 by the plaintiffs. The plaintiffs endorsed this plan from 1973 until it was rejected by the district court. The State Board itself adopted Plan A after hearings in 1975, and at the hearing held before Chief Judge Weber, only one defendant district opposed its implementation. Nevertheless, Chief Judge Weber rejected Plan A and another consolidation alternative (Plan 22-W) because he found "no evidence of broad base community support for such a remedy."[5] Order of November 18, 1977, p. 4, reprinted in Appendix at 211a.
 
 
 63
 The plaintiffs appealed this order. Judge Garth, writing for a divided court, held that there was no appealable order and dismissed the appeal. Hoots IV. Interestingly enough, Judge Garth observed in Hoots IV that:
 
 
 64
 The order of May 15, 1973 provided for submission of a plan within forty-five days. Inasmuch as the plaintiffs now regard the Commonwealth's Plan A as affording appropriate relief, a common base apparently exists from which a remedy may be expeditiously fashioned.
 
 
 65
 587 F.2d at 1351 n.57. As has already been exhaustively detailed, the Hoots IV admonition by Judge Garth did not result in the desegregation of GBASD or in any remedy for plaintiffs during the 26 months since that decision was filed.
 
 
 66
 The second "improvident appeal" resulted from the plaintiffs' motion of January 29, 1979 asking Chief Judge Weber to order the Commonwealth to submit one or more plans to the district court.[6] This motion followed repeated efforts by the court and the plaintiffs to move the Commonwealth to propose an acceptable plan.[7] When the district court by mid-April of 1979 had still taken no action on the January 29 motion, the plaintiffs petitioned this court for a writ of mandamus. This court denied the writ after receiving a response from Chief Judge Weber that he would "order a submission of a plan forthwith and schedule the plan for prompt hearings." Nowhere did this court indicate that the action of the plaintiffs was dilatory or frivolous.
 
 
 67
 Likewise, the plaintiffs' reluctant willingness to accept a tuition plan was more the result of frustration occasioned by the passage of school year after school year than it was a desire to see a tuition plan in use. Chief Judge Weber has regularly indicated to the plaintiffs that "the difficulty with ... any ... merger plan is what might be called community acceptance," and that a tuition plan "arouse(s) the least opposition." It is little wonder that the plaintiffs during the course of their 9 1/2 year battle would be willing to at least have considered the use of a tuition plan. It is also not surprising that, as able and conscientious attorneys, they would refuse to accept a tuition plan, as ultimately developed, which is unconstitutional on its face because it leaves completely unremedied grades K through 6. As I view the facts and history of this case, the plaintiffs have been flexible and willing to consider any alternative that might result in an effective remedy. In turn, they have been met by delay and inaction on the part of the court and defendants.
 
 D.
 THE 90-DAY REQUIREMENT
 
 68
 Finally, Judge Garth argues that, even if some time limitation is proper, 90-days is too short. I believe that the order is entirely appropriate and reasonable under the circumstances of this case. Most of the factual issues have been litigated and the legal issues briefed.[8] From its experience with the case for nearly ten years, the district court is also intimately familiar with the various options.
 
 
 69
 The need for a 90-day fixed time order, enforceable by mandamus if necessary, is evidenced by the failure of this court's admonition to the district court in Hoots IV to have a plan in place by the 1978-1979 school year. There Judge Garth wrote:
 
 
 70
 Having concluded that the November 18, 1977 order is not appealable, we have no jurisdiction to review it and thus must dismiss the plaintiffs' appeal. We are confident that, in light of the long history of this litigation and the sensitive, constitutional nature of the relief sought, the district court will require submission of a plan forthwith and certainly within the time limits of its original order, will expedite all further proceedings, and will give priority on its calendar to consideration and implementation of the plan. This being so, it would appear that an appropriate final order can be entered by year end which will grant plaintiffs the relief to which they are entitled under the district court's order of May 15, 1973.
 
 
 71
 587 F.2d at 1351 (footnote omitted).
 
 
 72
 To anyone who believes that the civil rights of our citizens are at least as important as the business rights of corporations, the dissent's explanation as to why it may be so difficult for a judge to act within 90 days on this 9 1/2 year-old case is absurd. Judge Garth is worried that there might be "unforeseen circumstances, illnesses, accidents, emergencies, deaths, court conflicts and the like." At 993. From my observation as a federal judge for more than 17 years, I have never found the federal courts impotent or unable to act with dispatch when important corporate or stockholder rights are involved.
 
 
 73
 Only last month, in Kennecott Corp. v. Smith, 637 F.2d 181 (3d Cir. 1980), we were willing to impose extraordinary time deadlines because of the needs of two corporations in a sixteen million dollar tender offer battle. On November 15, 1980, the district court in that case denied a motion by Kennecott for a preliminary injunction and vacation of a temporary restraining order, thereby preventing the continuation of the tender offer. "Because of the short time requirements for tender offers established by the SEC regulations," at 184, this court expedited briefing and appeal, and oral argument was held on December 11. On December 17, six days after oral argument, the panel, of which Judge Garth was a member, filed a 21-page opinion reversing the district court and directing it to conduct further proceedings "as expeditiously as possible." At 191 n.11. Normally, under the IOP's of our court, a judge must circulate a draft opinion to the active judges for eight days before it can be filed. IOP, Chapter IX(A)(3). In Kennecott, because of the importance of time to the corporations involved in the tender offer, this court held an expedited oral argument sixteen days after the district court's decision, and filed the opinion six days after that argument.[9]
 
 
 74
 If in corporate cases this court is willing to expedite its own procedures so dramatically to reduce judicial consideration by several months, I fail to understand why we may not require a district court judge to decide a civil rights case in three months when he has had it for almost ten years.
 
 II.
 The Intrusion Upon Judicial Independence
 
 75
 In the final analysis Judge Garth's ultimate conclusion is that "we have committed an almost unprecedented intrusion upon judicial independence." At 994. He cites only one case to explain why this is true Chandler v. Judicial Council, 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970). Chandler involved a tragic case of a district judge who was cantankerous to the extreme and in all probability mentally ill. As Justice Douglas commented, the Chandler "case has been and continues to be the liveliest, most controversial contest involving a federal judge in modern United States history." 398 U.S. at 130, 90 S.Ct. at 1677. There the Judicial Council of the Tenth Circuit had, because of "the attitude and conduct of Judge Chandler," found that he was "unable, or unwilling, to discharge efficiently the duties of his office; that a change must be made in the division of business and the assignment of cases in the Western District of Oklahoma;" and that for a period of time his cases had to be reassigned to other judges. 398 U.S. at 77-78, 90 S.Ct. at 1650. The Supreme Court denied him a writ of mandamus.
 
 
 76
 Two cases could hardly be more dissimilar. Here we are dealing with a judge who is well, competent and has not been disparaged personally or professionally. Even in Chandler when focusing on this problem, Chief Justice Burger observed:
 
 
 77
 There can, of course, be no disagreement among us as to the imperative need for total and absolute independence of judges in deciding cases or in any phase of the decisional function. But it is quite another matter to say that each judge in a complex system shall be the absolute ruler of his manner of conducting judicial business.
 
 
 78
 398 U.S. at 84, 90 S.Ct. at 1653 (emphasis added). Chief Justice Burger questioned whether "each judge (can) be an absolute monarch and yet have a complex judicial system function efficiently?" 398 U.S. at 86, 90 S.Ct. at 1654.
 
 
 79
 The dissent asserts that this court lacks the power to impose a time limitation on a district court judge because such a step is analogous to "stripp(ing)" him of his "caseload" as in Chandler. I find this analogy unpersuasive. We are not depriving the district court judge of his right to hear the case, as in Chandler, or to fashion a remedy, as in Lynd. While I do not disagree with Justice Douglas' concerns about preserving the independence of the federal judiciary, bluntly, Chandler is totally irrelevant to the instant case.
 
 
 80
 If one is seeking more relevant philosophical expressions of Justice Douglas, I submit that the Justice's opinion in Bell v. Maryland, 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964), involving the question of whether blacks could be denied equal public accommodations in a restaurant, would be far more apt. Twelve black students had been prosecuted for criminal trespass because they dared to believe they were entitled to unsegregated service at the Hooper's Restaurant in Baltimore. In urging that the indictment must be dismissed, Justice Douglas asserted:
 
 
 81
 We have in this case a question that is basic to our way of life and fundamental in our constitutional scheme. No question preoccupies the country more than this one; it is plainly justiciable; it presses for a decision one way or another; we should resolve it. The people should know that when filibusters occupy other forums, when oppressions are great, when the clash of authority between the individual and the State is severe, they can still get justice in the court. When we default, as we do today, the prestige of law in the life of the Nation is weakened.
 
 
 82
 378 U.S. at 244-45, 84 S.Ct. at 1824 (Douglas, J., concurring). If the dissent's views were accepted, this court would be defaulting on its obligations and "the prestige of law in the life of the Nation (would be) weakened."
 
 III.
 CONCLUSION
 
 83
 When dissenting in Hoots IV, Judge Gibbons asserted:
 
 
 84
 On the record before us, where the very object of the appeal is to cure unconscionable delay which is causing irreparable harm, the majority's reference to "the goal of speedy justice" as a justification for dismissing it rings hollow. And as to caseload considerations, this is one of those cases in which our concern about the caseload must yield to our obligation to enforce the supremacy of federal law.
 
 
 85
 587 F.2d at 1357. Since then, two more school years have gone by and the children still have received no relief. In an attempt to be moderate and responsible, the majority today has said that the district court must make a decision within 90 days.
 
 
 86
 At some point appellate judges must be as concerned about the human and civil rights of all of our citizens as they are fearful of offending their judicial colleagues or pears. I regret that I have been compelled to write so forcefully to a dissent, which if it were adopted, could have tragic implications for the weak, the poor and the dispossessed, whose rights are often denied and who must rely on the power of the federal court for ultimate vindication.[10]
 
 
 87
 What the majority has ordered is no radical decree. It is precedent as old as the Republic. More than two centuries ago Blackstone declared "it is a general indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, whenever that right is invaded." 3 Blackstone, Commentaries 23 (as cited in Marbury v. Madison, 5 U.S. 137, 163, 1 Cranch 137, 163, 2 L.Ed. 60 (1803)). In Marbury v. Madison, 5 U.S. at 161-63, 1 Cranch at 161-63, Chief Justice John Marshall asserted:
 
 
 88
 The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection.
 
 
 89
 The plaintiffs in this case are entitled "to claim the protection of the laws" because of the constitutional injuries they have sustained. After a 9 1/2 year persistent denial of their constitutional rights, the children of Allegheny County should not have to wait for more than an additional 90 days.
 
 
 90
 GARTH, Circuit Judge, dissenting.
 
 
 91
 I agree in large part with the majority, with its statement of historical events, with its holding that appellate jurisdiction here is predicated on 28 U.S.C. § 1292(a)(1)[1] and with its remand to the district court to complete the proceedings pending before it. I also agree that this protracted litigation should be completed as speedily as possible and thus should be accorded the very highest priority.
 
 
 92
 I disagree, however, with the majority's mandate for two reasons. As to the first, which has to do with the form of the mandate, I believe that our difference is semantic. As to the second I believe that our difference is profound and significant.
 
 I.
 
 93
 The majority's mandate recites "Therefore, we vacate the July 30, 1980 order of district court and remand for proceedings consistent with this opinion. The mandate of this court shall issue forthwith." (maj. op. at p. 981) In its prior paragraph, the majority states "... we order the district court to expedite its consideration of this case so that within ninety days of the issuance of the mandate of this court it shall:
 
 
 94
 1) complete all hearings and necessary proceedings on the merits of the competing remedial plans for the desegregation of GBASD;
 
 
 95
 2) decide the Milliken v. Bradley issue of which school districts may be included within an inter-district remedy; and
 
 
 96
 3) enter an appropriate final order granting appellants the relief to which they are entitled under the district court's order of May 15, 1973, such relief to be effective and implemented by the beginning of the first semester of the school year in the fall of 1981."
 
 
 97
 (footnote omitted) Id. at 981.
 
 
 98
 The majority thus incorporates within its mandate a 90 day time limit.
 
 
 99
 My first dispute with the mandate is that some may regard this mandate as a reversal of the district court order rather than as an affirmance, which it is. Indeed Judge Higginbotham, himself a member of the majority discusses in Part I B of his concurring opinion, not the problem that I have raised of a 90 day limit, but rather the reactions of a district court judge when he is reversed.
 
 
 100
 In point of fact and law, the majority affirmed Judge Weber's order of July 30, 1980. That order, which I reproduce in full in the margin, decreed the following:1a
 
 
 101
 (1) It denied the plaintiffs' request that the Tuition Plan and the tuition concept be rejected forthwith;
 
 
 102
 (2) It did so without prejudice to renewal of the hearings on the Tuition Plan;
 
 
 103
 (3) It denied the plaintiffs' request for an injunction "affording them merger, or consolidation relief beginning in the Fall of 1980";
 
 
 104
 (4) And it denied that injunction without prejudice.
 
 
 105
 What does the majority mandate do with respect to this order? It purports to vacate it! And then it remands for proceedings consistent with the majority opinion. And what does the majority opinion require? It requires precisely that which Chief Judge Weber provided in his July 30, 1980 order.
 
 
 106
 It requires the completion of "all hearings and necessary proceedings on the merits of the competing remedial plans" (maj. op. p. 981) a reference which obviously includes the Tuition Plan. I say "obviously", because in Paragraph 31 of the majority opinion, the majority recites quite explicitly "We decline to grant appellants' request that we require the implementation of merger or consolidation relief. We also decline at this time, to reject the concept of a Tuition Plan for GBASD. The primary duty to choose between these competing remedial plans rests with the district court." (maj. op. p. 980.)
 
 
 107
 Thus, as I understand it, and I consider myself a member of the majority for all purposes other than subscribing to the 90 day deadline, we have affirmed and not reversed the district court's order of July 30, 1980. By having cast our mandate in the form of "vacating and remanding" it appears to me that we have given an ambiguous direction, but one which has the same effect as a mandate which "affirms and remands". What we intended, and what we have done, is to affirm the actions and order of the district court. We have then directed that the action be remanded to the district court to continue and complete the proceedings the very action which the district court by its July 30, 1980 order contemplated and decreed.
 
 
 108
 Accordingly, so much of the concurring opinion which speaks to the issue of reversal and which interprets what I have said in this dissent as implicating reversals of district court orders, is without foundation and is irrelevant.
 
 II.
 
 109
 My second and more fundamental dispute with the mandate is that it incorporates within it a 90 day deadline which it imposes upon the district court. Those few words "within 90 days of the issuance of the mandate" carry the seeds of great mischief and potential disruption.
 
 
 110
 Because of the significant implications which this latter portion of the mandate has, I will devote virtually the whole of this dissent to demonstrating that we have no power to issue such an order; that such an order is unwise and inadvisable even if we had that power (and we do not); and if we sought to exercise this non-existent power we would have no means to enforce compliance with our orders.
 
 
 111
 The majority's mandate imposes a 90 day deadline upon the district court, (maj. op. p. 981). During that time, the district court must complete on order from our court, all matters and hearings pertaining to all plans and all proceedings. All issues, including the difficult and complicated Milliken v. Bradley[2] issue must be resolved by the district court, and an appropriate order entered so that a remedial plan may be implemented in time for the school term commencing September, 1981. In this opinion, I address myself only to the advisability, propriety and power of the judges of this court to order another federal judge, in this case Chief Judge Weber of the Western District of Pennsylvania, to perform his judicial functions under a 90 day deadline.
 
 
 112
 I dissent from the majority in this regard because:
 
 
 113
 (1) Even if Chief Judge Weber had been the cause of the delays which have plagued this litigation (which he has not), I know of no power available to us to impose upon him, such a sanction or order. (see discussion at p. 989, supra.)[3]
 
 
 114
 A fair analysis of the litigation to this point reveals clearly that any delays that have been suffered have come about not because of Chief Judge Weber's actions or inactions, but because of the litigants' changing positions and improvident detours through this Court. Thus, in my view, even apart from considerations concerning our power to impose a 90 day order, any deadline order which decrees that the burden of compliance be placed on Chief Judge Weber, is misconceived and misdirected.
 
 
 115
 (2) I firmly believe that it is inadvisable, unseemly, injudicious, improper and unrealistic to establish, by order, any time frame in which a district court judge must perform his judicial functions. An order such as this one can only lead to resentment on the part of one of the most diligent, conscientious, and hard-working judicial cadres the district court judges in this country. Moreover, an order such as this one, which could, but hopefully will not, lead to other orders of this character must in the long run rupture the sensitive relationship among court members of different judicial echelons and indeed may well be regarded by many of them as demeaning and even insulting.
 
 
 116
 (3) I know of no power by which we can assert the right to impose such an order and once imposed, enforce such an order if compliance does not result. I deliberately do not address the subject of wilful non-compliance, because I do not believe that any district court judge, no matter what his reaction to such an order might be, would wilfully refuse to meet a deadline ordered by a higher court. Thus, I am not suggesting that a failure to comply would be wilful. I am fearful, however, that the requirements of the Speedy Trial Act compounded by the exigencies of the normal district court civil calendar[4] which these days is crowded by competition for priority among different categories of statutory and constitutional cases, to say nothing of emergency applications and preliminary injunction proceedings and the fact that the district courts' jury and non-jury calendars are planned months in advance all militate against the probability that the 90 day mandate will be met. My fear is even greater in this particular case, because I recognize that Chief Judge Weber, in addition to the multitude of judicial matters to which he must attend as a functioning district court judge, must also deal with a multitude of intra-district administrative problems of not inconsiderable dimensions.
 
 
 117
 1. The Litigation Giving Rise to the 90 Day Mandate.
 
 
 118
 The majority opinion adequately and accurately sets forth the chronology of this action. To put my observations concerning the 90 day mandate in proper perspective, however, I think something more must be said respecting the reasons that this litigation has taken the length of time that it has. I do not intend to mention or dwell upon every aspect of this case, but I believe it is important to recognize that many, many months have literally been wasted by at least two improvident appeals[5] and the recent decision of the plaintiffs to change direction in midstream. It must be remembered that the plaintiffs unremittingly urged the consideration of a Tuition Plan and then abruptly, after many months, reversed their position and argued for its rejection.
 
 
 119
 The Hoots IV appeal, 587 F.2d 1340, was taken from an order of the district court entered in 1977. Hoots IV did no more than deny the appealability of an order refusing to implement a particular plan, without prejudice to the submission of additional plans. Thereafter, as the majority opinion observes, the plaintiffs sought the submission and approval of a Tuition Plan, which they desired the Commonwealth to prepare and submit. Indeed, the plaintiffs went so far as to file an application for a Writ of Mandamus which asked this court to order the district court "to direct the state defendants to submit another interdistrict plan which would involve the use of tuition as a technique to remedy the problem ..." (emphasis added). Within a month the district court ordered that the Commonwealth prepare and file a Tuition Voucher Plan. Hearings were commenced. Approximately one year later and while these hearings were still proceeding, the plaintiffs apparently had a change of heart, which was evidently prompted by the addition of new counsel. At this time, despite their earlier insistence upon a Tuition Plan, they now argued to have the Tuition Plan rejected. When this was denied by the district court, the plaintiffs once again appealed to this Court. They did so despite the fact that the district court had not concluded the hearings and therefore had neither recommended nor disapproved the Tuition Plan nor any other plan which was "waiting in the wings."
 
 
 120
 While I am sure that the majority would disclaim any intent to criticize the district court, my reading of its mandate leaves no doubt but that by its very nature, criticism is implied. It is evident that during the periods of time when appeals were proceeding before our court, the district court could take no action.[6] Nor can the district court be faulted for seeking to complete the hearings that it had started and for refusing to commence simultaneously a different set of hearings involving an inter-district consolidation plan, until after it had completed taking evidence on the Tuition Plan.
 
 
 121
 I am satisfied that Chief Judge Weber is as concerned about the school children in the General Braddock Area School District as are we. I am convinced that he is as disturbed and upset over the length of these protracted proceedings as are we. There can be no question that he deplores, as do we, the fact that these school children have been obliged to endure schooling in what has been acknowledged as an unconstitutional environment, and that they are victims of the delays which have been caused by some of the circumstances which I have underscored. I am also convinced that Chief Judge Weber would be overjoyed if he could put the final touches to all these proceedings, not within 90 days, but even earlier, if such were possible. I can think of no one more than he who would want to be relieved of these very considerable issues by their resolution. I am certain that even without our suggestions, he has placed and will continue to place these hearings and this litigation on his court's "most front burner", and I am equally certain that there would be no one more pleased than he if a plan were in place in time for implementation by September, 1981. However to achieve that goal, it is not necessary to "order" his court to complete what is "uncompletable" within an arbitrary and artificial timeframe. It is this subject that I address next.
 
 
 122
 2. The Wisdom of a 90 Day Mandate.
 
 
 123
 Passing over for the moment the very critical issue of whether this court has the power to order Chief Judge Weber to comply with its mandate, I observe that by imposing a time limit on a district court judge, this court has usurped unto itself the district court's scheduling functions, a matter which has traditionally and necessarily been committed solely to the district court.
 
 
 124
 As a former district court judge, I know the pressures under which district court judges operate and the very careful and meticulous scheduling of their cases. Jury cases are scheduled months in advance. So indeed are non-jury matters, although in some instances these can be squeezed into the open days or hours that occur when a jury trial or other proceeding is unexpectedly terminated or recessed. Moreover, with the dismissal sanction now in force under the Speedy Trial Act, a forced reorganization of a district court schedule could result in serious consequences leading possibly to the discharge of criminal defendants whose trials were not timely commenced. Interwoven throughout this complex of judicial functions are the multitude of motions, emergency and otherwise, which must be heard and decided; sentencings, preliminary hearings, and the preparation of opinions, yes, and in many cases, service on this very Court of Appeals when our manpower needs have required it. Indeed, Chief Judge Weber sat as a member of a panel of this court within the past few months and is accordingly responsible for the opinions assigned to him which were generated by that sitting. In his particular case as Chief Judge, I have earlier noted that he must attend to many administrative matters from which other judges are freed.
 
 
 125
 I detail this listing, which is incomplete by far, only to illustrate the impracticality of ordering a district court judge to perform his tasks in a sound, conscientious, thoughtful and knowledgeable manner, limited however to a specific period of time, such as 90 days. I note for instance that this very appeal which was argued on November 3rd has taken more than 60 days to resolve by written opinion, and we, unlike the district court, had no evidentiary hearings, with all the uncertainties to which they are heir, confronting us. I would not like to hazard a guess as to the reactions of my colleagues on this court, if another court having the same lack of knowledge of our responsibilities and schedules as we have respecting Chief Judge Weber's responsibilities and schedule, ordered us to complete a highly complicated hearing and file an opinion for ultimate implementation within a deadline of a limited number of days.
 
 
 126
 To this point I have not even mentioned those unforeseen circumstances, illness, accidents, emergencies, deaths, court conflicts, and the like, which could add to the time needed to complete the hearings and resolutions mandated to be completed within 90 days. I note only the profound practical considerations which up to this time have restrained Courts of Appeals from intruding upon the functions of the district court.
 
 
 127
 I have gone into some detail in setting forth these matters because I want to emphasize how very unrealistic and inadvisable this court's mandate is. Hopefully, Chief Judge Weber will complete the tasks which the majority opinion requires him to complete, and will do so within 90 days.[7] If he cannot because of his other commitments or because of the nature of the proceedings themselves, does he then transfer Hoots to another judge in the Western district, thereby losing his "investment" of some eight years? And if this may be the result of the 90 day mandate, is it realistic to assume that a new judge will have a plan in place for the September 1981 term? My own view of this matter is that intricate scheduling, such as is involved here, ought not to be supervised from the far reaches of a Court of Appeals chambers. Some cases take longer than others to complete, just by their very nature. If indeed this is one of those cases, then I suggest that less harm and mischief will result if we properly permit the district court to adjust its own schedule, once that court has been advised that the highest priority should be given to this case.
 
 
 128
 3. Enforcement.
 
 
 129
 I have attempted to explain why the history of this litigation and the inherent functions of the district court make it impractical and inadvisable for us to set a specific time limit for the discharge of particular district court functions. Until this point I have not referred to our power to order the district court to perform these functions within a timeframe. I am convinced that we have no such power, and any attempt to exercise such a nonexistent supervisory power can only result in embarrassment or disaster. Thus by having ordered this district court judge to perform and complete all Hoots matters pending before him in no longer than 90 days we have committed an almost unprecedented intrusion upon judicial independence.[8]
 
 
 130
 Justice Douglas, dissenting in Chandler v. Judicial Council, 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970) referred to this very subject. He did so in the context of an action brought by a district court judge who had his caseload stripped from him because he was unable or unwilling to discharge efficiently the duties of his office. Judge Chandler was not directed, as the majority has directed Chief Judge Weber, to perform discretionary functions within a specified time limit. In the course of his dissenting opinion, Justice Douglas made these observations which are every bit as pertinent today:
 
 
 131
 An independent judiciary is one of this Nation's outstanding characteristics. Once a federal judge is confirmed by the Senate and takes his oath, he is independent of every other judge. He commonly works with other federal judges who are likewise sovereign. But neither one alone nor any number banded together can act as censor and place sanctions on him. Under the Constitution the only leverage that can be asserted against him is impeachment, where pursuant to a resolution passed by the House, he is tried by the Senate, sitting as a jury. Art. I, § 2 and § 3. Our tradition even bars political impeachments as evidenced by the highly partisan, but unsuccessful, effort to oust Justice Samuel Chase of this Court in 1805. The Impeachment Provision of the Constitution indeed provides for the removal of "Officers of the United States," which includes judges, on "Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors." Art. II, § 4.
 
 
 132
 What the Judicial Council did when it ordered petitioner to "take no action whatsoever in any case or proceeding now or hereafter pending" in his court was to do what only the Court of Impeachment can do. If the business of the federal courts needs administrative oversight, the flow of cases can be regulated. Some judges work more slowly than others; some cases may take months while others take hours or days. Matters of this kind may be regulated by the assignment procedure. But there is no power under our Constitution for one group of federal judges to censor or discipline any federal judge and no power to declare him inefficient and strip him of his power to act as a judge.
 
 
 133
 The mood of some federal judges is opposed to this view and they are active in attempting to make all federal judges walk in some uniform step. What has happened to petitioner is not a rare instance; it has happened to other federal judges who have had perhaps a more libertarian approach to the Bill of Rights than their brethren. The result is that the nonconformist has suffered greatly at the hands of his fellow judges.
 
 
 134
 The problem is not resolved by saying that only judicial administrative matters are involved. The power to keep a particular judge from sitting on a racial case, a church-and-state case, a free-press case, a search-and-seizure case, a railroad case, an antitrust case, or a union case may have profound consequences. Judges are not fungible; they cover the constitutional spectrum; and a particular judge's emphasis may make a world of difference when it comes to rulings on evidence, the temper of the courtroom, the tolerance for a proffered defense, and the like. Lawyers recognize this when they talk about "shopping" for a judge; Senators recognize this when they are asked to give their "advice and consent" to judicial appointments; laymen recognize this when they appraise the quality and image of the judiciary in their own community.
 
 
 135
 There are subtle, imponderable factors which other judges should not be allowed to manipulate to further their own concept of the public good. That is the crucial issue at the heart of the present controversy.
 
 
 136
 All power is a heady thing as evidenced by the increasing efforts of groups of federal judges to act as referees over other federal judges.
 
 
 137
 398 U.S. 136-37, 90 S.Ct. 1648, 1680, 26 L.Ed.2d 100 (footnotes omitted).
 
 
 138
 Justice Douglas concluded his observations by saying:
 
 
 139
 It is time that an end be put to these efforts of federal judges to ride herd on other federal judges. This is a form of "hazing" having no place under the Constitution. Federal judges are entitled, like other people, to the full freedom of the First Amendment. If they break a law, they can be prosecuted. If they become corrupt or sit in cases in which they have a personal or family stake, they can be impeached by Congress. But I search the Constitution in vain for any power of surveillance that other federal judges have over those aberrations. Some of the idiosyncrasies may be displeasing to those who walk in more measured, conservative steps. But those idiosyncrasies can be of no possible constitutional concern to other federal judges.
 
 
 140
 398 U.S. 140-41, 90 S.Ct. 1648, 1682, 26 L.Ed.2d 100 (footnote omitted).
 
 
 141
 Although these remarks were written in dissent, none of the other Justices in Chandler either refuted, or took issue with them. These principles lead inexorably to the conclusion that in circumstances such as are present here, we have neither the right nor any power to order Chief Judge Weber to complete his processing of this case within a time limit of 90 days. If there is such a right or power, I do not know from whence it stems,[9] and absent such a power, there is no reason for a federal judge to give heed to our mandate.
 
 
 142
 Such a consideration, I am sure, would never cross Chief Judge Weber's mind. I am certain that all of us know, that even if he were to endanger his own health in so doing, he would make every effort to meet the time strictures which the majority, in my view, has so improvidently imposed upon him. Yet, if despite these efforts, he cannot, or does not, do we hold him in contempt? Do we subject him to some form of disciplinary proceeding? Do we remove his caseload? Do we hold a hearing and ask him to show cause why he has violated the 90 day mandate? What action can we take? And should we as a Court of Appeals point a gun without the ability to pull its trigger? I recognize that the illustration is extreme, but it conveys my feeling that one should not order what one cannot enforce. To do so can only lead to embarrassment on our part, or to put the matter colloquially, I fear we shall end up with "egg on our face." Even worse, from the standpoint of the district court, is the humiliation of being ordered to do that which is "undoable". The order itself carries with it a flavor of opprobrium and, to the extent that it implies our disapproval of the district court's prior actions, it carries with it a stigma that will be difficult to erase.
 
 
 143
 I ask additional questions. Does a mandate such as the majority has imposed anticipate that if the tasks to be accomplished cannot be completed in the judge's normal, competent, workmanlike manner, is he to rush the hearings (with all that such haste implies), skimp on the decisional processes, and produce a product which may not withstand constitutional or appellate scrutiny? If so, what have we accomplished in our efforts to expedite a school plan?
 
 
 144
 Finally, even if Chief Judge Weber could, and does, accomplish the impossible and furnish us with a complete resolution of all issues within 90 days, I am convinced that this would have been accomplished in any event and without the reproach implied by the majority's direction.
 
 III.
 
 145
 Before concluding this dissent I feel obliged to answer some of the irrelevant arguments found in the concurring opinion.
 
 
 146
 Unfortunately the author of the concurring opinion in his understandable zeal to solve the school problems in the General Braddock District as soon as possible, has misread both the majority opinion in which he has joined, and my dissent. Thus, he seemingly has failed to understand that the majority opinion does not reverse the district court, see pp. 989-990, supra, but rather affirms it. He has also failed to understand that my third reason for dissenting is not because I find a "90 day requirement ... too restrictive", (concurring op. p. 982), but rather because I know of no means by which any such time limit may be enforced (see pp. 994-996, supra ).
 
 
 147
 Finally, Judge Higginbotham fails to understand that the only disagreement I have with the majority is with its imposition of a specific deadline on a district court judge. Thus, the examples which he cites of instances where Courts of Appeals have acted themselves or have directed the district courts to engage in ministerial actions, are completely inapposite. Judge Higginbotham refers in his opinion (concurring op. p. 982) to cases where Courts of Appeals have granted injunctions at the Court of Appeals level. Such actions obviously have nothing to do with a Court of Appeals order which commands that a district court deal with discretionary and evidentiary matters within a particular time frame.
 
 
 148
 In my dissent I have not addressed the power of a Court of Appeals either to enter an order itself or to order a district court to perform a non-discretionary ministerial act, because this case involves neither. Thus the relevance of Judge Higginbotham's observations concerning such circumstances escapes me. I note, however, that if such a circumstance was relevant, which it is not, Judge Higginbotham could have referred to this court's opinion in Evans v. Buchanan, 582 F.2d 750 (3d Cir. 1978), to illustrate his thesis. In Evans, supra, this court ordered the district court to enter a particular order, but that order had first been drafted by the Court of Appeals and nothing remained to be done except to have it entered. Had the district court failed or refused to follow our direction to perform this ministerial act, we could not have compelled it. Obviously, however, this court had the power to enter that order itself, had it become necessary. This, however, is not the situation which is at issue here.
 
 
 149
 In this case Judge Higginbotham could have voted to have an order entered by this court. He could have voted to have granted to the plaintiffs the relief that they sought and he could have voted to afford that relief at the Court of Appeals' level. And if he felt, as he evidently does, that the particular nature of this litigation is such that it required this court, rather than a district court to hold hearings or to enter a remedial order without holding hearings, he could have so voted. He did not. Rather, Judge Higginbotham joined the majority and voted to return this case to the district court so that the district court judge could continue the hearings that he, the district court judge, had ordered, and in so doing could perform his proper function of taking evidence and fashioning a remedial plan. Accordingly, Judge Higginbotham's exhortations about what has been done in other courts and what should have been done in this case totally miss the mark.
 
 
 150
 Of more concern to me than Judge Higginbotham's lack of understanding of the difference between actions taken by a Court of Appeals itself and those actions which it orders a district court to perform within a prescribed time limit, is the assertion by Judge Higginbotham that this court has the power to supervise the activities of a district court judge in his functions and that we may exercise that power on an hour-to-hour and day-to-day basis.
 
 
 151
 I note with considerable interest that nowhere in Judge Higginbotham's opinion, however, does he furnish for our guidance and edification any authority from which this power emanates. Nor does he refute the analysis of Justice Douglas in Chandler, supra, (see pp. 994-995 of this dissent, supra ) which concludes that there is no such power to be found anywhere in our Constitution or statutes. I assume that if Judge Higginbotham knew of such authority, he would have cited it. He does not, because none exists.
 
 
 152
 In this connection, therefore, it is of no help whatsoever to have the concurring opinion direct us to Bell v. Maryland, 378 U.S. 266, 84 S.Ct. 1814, 12 L.Ed.2d 822 (concurring op. p. 988) which holds no more than that where an intervening state statute made it unlawful for restaurants to deny services to individuals because of their race, the proceeding had to be remanded to state court for reconsideration in light of that statute. Justice Douglas whose concurrence in that case urged the Court to reach the merits of the plaintiffs' claims and reverse their convictions outright, is apparently cited by Judge Higginbotham as authority for the presence of our power over district court judges.
 
 
 153
 I make two observations. If Judge Higginbotham is urging us to reach the merits of the plaintiffs' claims in this case, he has abandoned that battle himself, for as I have mentioned, he has voted to affirm Chief Judge Weber's order and to remand for further proceedings. My second observation is that Bell v. Maryland does not even address, let alone establish, the power of a superior court over the activities and functions of district court judges. One can look long and hard through the Bell opinion and not find even a reference to a district court judge. This is completely understandable, as that case came before the Supreme Court from the Maryland state court. I therefore question its relevance in the instant context.
 
 
 154
 I will make just a few more comments about Judge Higginbotham's disagreement with my thesis.
 
 
 155
 First, I concede that if Judge Higginbotham had been a member of the Hoots IV panel, he would have agreed with Judge Gibbons' approach that the Hoots IV order was appealable. That was the only issue decided in Hoots IV, i. e., whether this court had jurisdiction of the appeal. A majority of the panel held that it did not. Thus, Judge Higginbotham's espousal of Judge Gibbons' dissent in that case reflects no more than a difference of opinion as to what constitutes a final or injunctive order from which an appeal may be taken.
 
 
 156
 Second, the concurring opinion refers to our recent Kennecott[10] decision as demonstrating this court's ability to deal with an emergent matter and to deal with it in a remarkably short time. Its thesis apparently is that if the Court of Appeals can operate expeditiously, there is no reason why a district court judge cannot. However, Judge Higginbotham overlooks one salient fact: what this court may do has no bearing upon what the district court does, or upon the district court's commitments, its functions and our power to order that court to conform to our dictates.
 
 
 157
 I suggest that it is illogical to extrapolate from our discussion of "delay" in Kennecott, the principle that we can impose a 90 day deadline in Hoots. Nevertheless, if someone more astute than I, can discern a relationship between the principles enunciated in a Securities Regulation case and the power to supervise a district court judge, I still find that Judge Higginbotham's concurrence in this respect defies reason. He states, "(i)f in corporate cases this court is willing to expedite its own procedures so dramatically to reduce judicial consideration by several months, I fail to understand why we may not require a district court judge to decide a case in three months when he has it for almost ten years." I can only suggest that this dissent has gone into considerable detail in order to explain why we cannot.
 
 
 158
 Third, Judge Higginbotham's references to our Internal Operating Procedures and the time limits which we have voluntarily imposed upon ourselves are as irrelevant to the issue here as his other arguments (concurring op. p. 983). I have no problem if a district court judge voluntarily imposes a deadline upon himself, any more than I have any problem with the members of our court voluntarily imposing deadlines upon themselves whether for the circulation or the preparation of their opinions, or otherwise. A problem would be presented, however, if either the Congress, or the Supreme Court, or the President, were to direct us to prepare and file all of our opinions within a specified time limit, for example, 45 days.
 
 
 159
 In the first place, they would have no power to do so. Second, it would be inadvisable. Third, there would be no means at their disposal, short of impeachment, for them to enforce such a command. Thus, there is just no logical nexus that can be perceived between a voluntary self-imposed deadline and a 90 day mandate such as the majority has imposed in this case.
 
 
 160
 Finally, I suggest that the references made in the concurring opinion to other than the 90 day deadline imposed by the mandate, are irrelevant. Thus, I do not find it necessary to address each and every feature of the concurrence because as I have indicated, not one of them focuses on the questions to which the mandate's 90 day order has given rise:
 
 
 161
 (1) Does this court have either statutory or constitutional power to order a district court judge to perform his judicial functions within any set period of time where the district court's functions to be performed are discretionary, evidentiary and nonministerial in character;
 
 
 162
 (2) if so, from where does that power come and what are the parameters of that power;
 
 
 163
 (3) even assuming the presence of this power, (a power I do not believe we have and nothing that Judge Higginbotham has written persuades me otherwise) is it advisable and realistic to exercise that power over a district court judge and his functions; and
 
 
 164
 (4) if we have such a power and if it is advisable to exercise it, can we enforce compliance?
 
 
 165
 I have answered these questions in this dissent. I have said we do not have the power; it is not advisable to exercise the power even if we had it, and if we have the power and did act to exercise it, we could not enforce it. There is nothing that appears in Judge Higginbotham's concurring opinion which alters these conclusions.
 
 IV.
 
 166
 I regret having written at such length on a subject which superficially, at least, appears to be a small part of the mandate, but which in reality has profound implications, which I believe even dwarfs the basic issues before us. Because its significance in terms of judicial independence and judicial relationships cannot be ignored, I cannot subscribe to, or let go unanswered, this aspect of the majority mandate which I regard as improvident, unadvisable, unrealistic, dangerous and unenforceable. I, for one, reject the notion that the members of this court can "arrogate to themselves" and exercise such powers over the federal district court judges, particularly since no authority to do so is to be found in our Constitution or laws. See Chandler, supra, p. 10 at 142, 90 S.Ct. at 1683 (Black, J., dissenting).
 
 
 167
 I therefore respectfully dissent from so much of the mandate as imposes a fixed time period upon Chief Judge Weber for the completion of the Hoots proceedings.
 
 SUR PETITION FOR REHEARING
 
 168
 Before SEITZ, Chief Judge, ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 
 
 169
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 170
 In their Petition for Rehearing, the appellees again claim, as the dissent did, that a 90 day time limit "is an unprecedented intrusion" upon a district court's power. Petition for Rehearing at 10. I vote to deny the petition for the reasons stated in my prior concurring opinion and in Judge Hunter's opinion. I also point out that this court has previously been willing, when dealing with corporate litigation, to impose a more rigid time limit on a district court judge than we have imposed in the present case. In Kohn v. American Metal Climax, Inc., 458 F.2d 255 (3d Cir.), cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972), minority stockholders brought suit on April 8, 1970 to enjoin the amalgamation of their company and another corporation because the merger allegedly violated Section 10(b) of the Securities and Exchange Act of 1934, and Section Seven of the Clayton Act. The district court on August 12, 1970 preliminarily enjoined the amalgamation. In an order of August 31, this court amended a prior order staying the injunction, and directed that the district court "proceed promptly with the trial and disposition of this case on the merits so that it may enter its Final Judgment prior to October 29, 1970" that is, within 60 days of the court of appeals' order. The subsequent opinions of the district and appellate courts are reported at 322 F.Supp. 1331 (E.D.Pa. 1970) and 458 F.2d 255 (3d Cir. 1972). While parties may disagree on what is an appropriate time limit in a particular case, the power to impose some time limit is clear. Civil rights litigants have rights equal to corporate parties in assuring an expeditious disposition of their legal claims.
 
 
 
 [1]
 There have been four previous published opinions: Hoots v. Commonwealth of Pennsylvania, 334 F.Supp. 820 (W.D.Pa.1971) (Hoots I ) (denying defendants' motion to dismiss for failure to state a cause of action); Hoots v. Commonwealth of Pennsylvania, 359 F.Supp. 807 (W.D.Pa.1973) (Hoots II ) (holding that the creation of the General Braddock School District by the Pennsylvania State Board of Education was an act of de jure discrimination in violation of the fourteenth amendment); Hoots v. Commonwealth of Pennsylvania, 495 F.2d 1095 (3d Cir.), cert. denied 419 U.S. 884, 95 S.Ct. 150, 42 L.Ed.2d 124 (1974) (Hoots III ) (dismissing appeals from district court's denial of school districts' petitions to intervene); and Hoots v. Commonwealth of Pennsylvania, 587 F.2d 1340 (3d Cir. 1978) (Hoots IV ) (dismissing appeal from order denying approval of a remedial plan for lack of appellate jurisdiction)
 In addition we have denied plaintiffs' applications for writ of mandamus on two occasions. Hoots v. Weber, No. 79-1474 (3d Cir. May 2, 1979); Hoots v. Weber, No. 80-2124 (3d Cir. Sept. 9, 1980).
 
 
 [2]
 Hoots IV, 587 F.2d 1340 (3d Cir. 1978)
 
 
 [3]
 The original complaint is reprinted in Appendix for Appellants at 17a-32a. An amended complaint filed on July 30, 1971, is reprinted in Appendix for Appellants at 45a-62a
 
 
 [4]
 Hoots II, 359 F.Supp. at 823
 
 
 [5]
 Hoots II, 359 F.Supp. at 824-25
 
 
 [6]
 Reprinted in Appendix for Appellants at 203a-207a
 
 
 [7]
 The plan would have consolidated seven school districts into three. See Hoots IV, 587 F.2d at 1345 n.27
 
 
 [8]
 Reprinted in Appendix for Appellants at 208a-215a
 
 
 [9]
 The district court's memorandum order observed:
 (i)t now appears to the Court that the most workable plan would be a tuition voucher plan which would enable all students of the General Braddock Area School system to achieve a quality education free from the effects of the segregation pattern now existing, by the adoption of a tuition voucher plan available to all the General Braddock Area students above the elementary school level, making use of the physical plants and facilities, and the variety of educational programs offered by nearby school districts.
 Appendix for Appellant at 313a.
 
 
 [10]
 The following school districts were added: Turtle Creek Area School District; Edgewood School District; West Mifflin School District; Steel Valley School District; East Allegheny School District; Swissvale Area School District; Churchill Area School District; and Gateway School District. Appendix for Appellants at 316a
 
 
 [11]
 Milliken v. Bradley, 418 U.S. 717, 744-745, 94 S.Ct. 3112, 3126-3127, 41 L.Ed.2d 1069 (1974), discussed "the validity of a remedy mandating cross-district or interdistrict consolidation to remedy a condition of segregation found to exist in only one district:"
 The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation .... Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation .... without any interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy.
 
 
 [12]
 On August 3, 1980, the Commonwealth had moved for an extension of the August 15, 1980 deadline for submission of its plan. The motion was unopposed and was granted on August 7, 1980
 
 
 [13]
 Excerpts from the Commonwealth's May 15, 1980 plan are reprinted in Appendix for Appellants at 358a-474a
 
 
 [14]
 On August 4, 1980, the Commonwealth moved to withdraw the Metropolitan Plan from the district court's consideration. The court has not ruled on this motion. Transcript of Oral Argument, Hoots v. Commonwealth of Pennsylvania, No. 80-2116, at 92, 639 F.2d 972 (3d Cir. 1980)
 
 
 [15]
 There is some dispute between the parties as to the scope of the July and August district court hearings. At the conclusion of oral argument, we requested the parties to submit letters addressing the question of whether the hearings were limited to consideration of the Tuition Plan or whether they also included consideration of interdistrict consolidation plans as well
 We have reviewed the submissions by the parties and believe that the trial court intended to limit the hearings to the question of whether it should adopt the Tuition Plan. Although the court received some evidence concerning the advisability of implementing interdistrict consolidation relief, the Tuition Plan remained the primary focus of the hearings.
 
 
 [16]
 The district court left open the possibility that it might order the Commonwealth to modify the plan to include grades K-6. Transcript, Hoots v. Commonwealth of Pennsylvania, No. 71-538, at 192-93 (W.D.Pa. July 14, 1980)
 
 
 [17]
 The district court's July 30 order provided:
 
 
 [1]
 Plaintiffs' request of July 30, 1980 that the Tuition Plan and the tuition concept be rejected forthwith is denied, without prejudice to its renewal at the end of the hearings on said Plan
 
 
 [2]
 Plaintiffs' request of July 30, 1980, that this Court grant them an injunction affording them merger, or consolidation relief beginning in the fall of 1980 is denied, without prejudice
 Reprinted in Appendix for Appellant at 584a.
 
 
 [18]
 Section 1291 provides:
 The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, ... except where a direct review may be had in the Supreme Court.
 
 
 [19]
 Section 1292(a)(1) provides:
 (a) The courts of appeals shall have jurisdiction of appeals from:
 (1) Interlocutory orders of the district courts of the United States, ... or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court.
 
 
 [20]
 That case involved the desegregation of the Nashville, Tennessee schools. The school board had submitted a plan for desegregation relief to the district court, but the court stayed indefinitely all proceedings pending the Supreme Court's decision of desegregation cases on its docket. The Sixth Circuit held that a stay for an indefinite time was appealable as a final order under § 1291, and vacated the stay
 
 
 [21]
 Judge Higginbotham is of the view that there is also appellate jurisdiction under 28 U.S.C. § 1291 (1976)
 
 
 [22]
 See n. 17, supra
 
 
 [23]
 Cf. United States v. Texas Educational Agency, No. 79-2833 (5th Cir. Nov. 15, 1979) (Court of appeals took jurisdiction over trial court's denial of immediate injunctive relief in school desegregation case)
 
 
 [24]
 See discussion at n. 15, supra
 
 
 [25]
 Although our order is necessarily directed to the district court, we fully recognize that the delay in this litigation is in large part attributable to the actions of the parties, and not to the Chief Judge of the Western District, who has valiantly and ably wrestled with the complex issues of this case since 1971. Thus, contrary to the assertion made by the dissent, our order does not reflect any criticism, implied or express, of the Chief Judge's conduct of the litigation. Accordingly we admonish the parties to provide the district court with whatever assistance it may require to comply with our mandate
 
 
 [26]
 Cf. Anderson v. Dougherty County Board of Education, 609 F.2d 225, 226 (5th Cir. 1980) (Court of appeals ordered district court to adopt a desegregation plan within sixty days of entry of its order)
 
 
 [1]
 If I had been a member of the panel in Hoots IV, 587 F.2d 1340 (3d Cir. 1978), I would probably have agreed with Judge Gibbons' dissent. From my view, Judge Gibbons' conclusion was unassailable. As he wrote:
 On the record before us, where the very object of the appeal is to cure unconscionable delay which is causing irreparable harm, the majority's reference to "the goal of speedy justice" as a justification for dismissing it rings hollow. And as to caseload considerations, this is one of those cases in which our concern about the caseload must yield to our obligation to enforce the supremacy of federal law. There is no justification for dismissing this appeal.
 587 F.2d at 1357 (footnote omitted).
 
 
 [2]
 I would like to make it clear that I have high regard for Chief Judge Weber. While I am dissatisfied with his pace in handling this particular case, my opinion is not intended to be disparaging of him as a Judge or as a person
 
 
 [3]
 See generally Note, Judicial Performance in the Fifth Circuit, 73 Yale L.J. 90 (1963)
 
 
 [4]
 An earlier appeal was taken by the defendants but presumably the plaintiffs cannot be charged with the delay incident to it. Hoots III, 495 F.2d 1095 (3d Cir.), cert. denied, 419 U.S. 884, 95 S.Ct. 150, 42 L.Ed.2d 124 (1974)
 
 
 [5]
 It is axiomatic that community resistance to a desegregation remedy is an inappropriate rationale for rejecting an otherwise acceptable plan. Brown v. Bd. of Educ. of Topeka, Kansas (Brown II), 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955); Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Monroe v. Bd. of Comm'rs of the City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968)
 
 
 [6]
 After Chief Judge Weber's initial 1973 order directed the Commonwealth to submit a plan for desegregation within 45 days, the Commonwealth sought and received two extensions which resulted in the passing of the 1973-1974 and 1975-1976 school years without a remedy in place
 
 
 [7]
 It is clear that if a defendant fails to come up with an adequate remedy then the duty falls upon the district court to "make every effort to achieve the greatest possible degree of actual desegregation." Davis v. School Comm'rs of Mobile County, 402 U.S. 33, 37, 91 S.Ct. 1289, 1291, 28 L.Ed.2d 577 (1971). The federal courts have the authority to formulate broad remedies. Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); Keyes v. School District No. 1, Denver, Colorado, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The district court's granting of two major extensions to the Commonwealth when the latter failed to discharge its duties under the 45-day order cannot be attributed in any way to the plaintiffs
 
 
 [8]
 For example, the Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), issue has been briefed four times before Chief Judge Weber since 1974
 
 
 [9]
 The opinion of the court in Kennecott repeatedly stresses the critical need to avoid delay when courts are issuing injunctions in tender offer battles. Delay would have "detrimental effects on the stock market" and undermine the "market approach of the Williams Act." At 189, 190. An evidentiary hearing to determine the impact of delay was held to be unwarranted because, as found by Congress in passing the Williams Act, "it would not be possible to recast the balance between incumbent and challenger." At 190. The dissent finds Kennecott distinguishable because it involves the Court of Appeals placing a time limitation on itself, rather than on the district court. At 998. Kennecott is cited, however, to refute the dissent's proposition that, assuming time limitations are proper, the court's workload makes a 90-day deadline unreasonable
 
 
 [10]
 While I recognize that reasonable persons may often disagree on substantive matters, nevertheless, and with all due respect, I believe that the reasoning of the dissent is as specious as that declared in Chief Justice Taney's lamentable and erroneous Dred Scott decision. There Chief Justice Taney declared that under the Declaration of Independence and the United States Constitution a black man "had no rights which the white man was bound to respect." Dred Scott v. Sanford, 60 U.S. 393, 407, 19 How. 393, 407, 15 L.Ed. 691 (1857). For scholarly analyses of the error of the Dred Scott decision, see Fehrenbacher, The Dred Scott Case, (1978); Vincent C. Hopkins, Dred Scott Case (1967); Walter Ehrlich, They Have No Rights: Dred Scott's Struggle for Freedom (1979)
 
 
 [1]
 Hoots v. Commonwealth of Pennsylvania, 587 F.2d 1340 (3d Cir. 1978) (Hoots IV ) disposes of any contention that the order from which this appeal is taken could be the predicate for final order jurisdiction under 28 U.S.C. § 1291
 ORDER
 AND NOW, this 30th day of July, 1980, it is HEREBY ORDERED and DECREED that:
 
 
 [1]
 Plaintiffs' request of July 30, 1980, that the Tuition Plan and the tuition concept be rejected forthwith is DENIED, without prejudice to its renewal at the end of the hearing on said Plan
 
 
 [2]
 Plaintiffs' request of July 30, 1980, that this Court grant them an injunction affording them merger, or consolidation relief beginning in the fall of 1980 is DENIED, without prejudice
 
 
 [2]
 The Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Milliken I ) issue, which the district court must resolve, involves the question of which districts are to be included in a remedial plan. For example, the Churchill district has steadfastly maintained the under Milliken I, it cannot be regarded in the same fashion as those districts which were created simultaneously with the General Braddock Area School District. See Hoots IV at 1342 n.5. The district court has ordered briefing on this issue, but it is unclear whether evidentiary hearings must still follow. The resolution of this issue is apparently the key to any interdistrict remedy
 
 
 [3]
 The majority, as I do, recognizes, as it must, that Chief Judge Weber has "valiantly and ably wrestled with the complex issues of this case since 1971." (maj. op. p. 981, n.25)
 
 
 [4]
 The 1980 Annual Report of the Director of the Administrative Office of the United States Courts notes that in 1980 civil cases filed in the U. S. district courts have continued to rise to a point that the filings were more than 9% above the 154,666 cases filed in 1979, and 93.3% over the civil filings reported in 1970. As of June 30, 1980 pending civil cases numbered 186,113, more than 8,000 over the number recorded one year earlier (p. 2-3)
 
 
 [5]
 I do not take the position that the plaintiffs did not have the right to appeal. All litigants have the right to do what they believe is best in order to further their interests and that includes taking appeals to this court, even when in so doing, substantial delays in the ultimate resolution of their problems ensue. I do mean to emphasize that the delays which the majority now seeks to attribute to the district court, even though it transparently disclaims that intention in its footnote 25, are delays wholly caused by litigational strategies. Thus, if a generation of school children has gone through the school system in this district under circumstances which have violated their constitutional rights, that delay may not be attributed to Chief Judge Weber
 
 
 [6]
 Despite the fact that jurisdiction of these proceedings was in this Court, we note that during the pendency of this appeal, the district court in an effort to conclude these proceedings, did, in fact, continue them at least through November 13
 
 
 [7]
 The same evils that lurk in a 90 day mandate are equally present in a mandate specifying any particular deadline. Thus I would have the same objection if the mandate here limited the district court in the discharge of its functions to 120 days, 200 days or 240 days, etc
 
 
 [8]
 I know of no other instance, in this Circuit, when an order was fashioned with a specific time limit. Even in Kelley v. Metropolitan County Board of Education of Nashville, Tennessee, 436 F.2d 856 (6th Cir. 1970), a case relied upon by the dissent in Hoots IV, no such deadline mandate was imposed. Kelley, which held that final order appellate jurisdiction vested in an appellate court under the circumstances of that case, involved school segregation issues that had lingered for fifteen years, id. at 858, and had been subject to an order which stayed all proceedings for an indefinite time. Yet, even in that egregious circumstance, no specific time limit was mandated during which the district court was to perform its functions
 The majority opinion here, however, calls attention to Anderson v. Dougherty County Board of Education, 609 F.2d 225 (5th Cir. 1980), in which a sixty day time limit was imposed on the district court.
 My chambers was orally advised by the Fifth Circuit clerk's office that argument in Anderson was held on November 6, 1979. The opinion was filed on January 7, 1980. Thus, as it has in this case, it took the Court of Appeals about sixty days to prepare draft and file its own opinion.
 I believe that the order entered in Anderson is as improvident and improper as the order entered here. I note that nothing appears in the Anderson opinion, or by the Anderson panel members, commenting on this aspect of the mandate. And so it is impossible to tell whether that mandate would have issued in its sixty day form had the considerations which I urge here been called to that court's attention. I believe that had the panel there focused on the matters with which I express concern, that court may well have eschewed the 60 day time limit in its mandate.
 By the same token, the unreported proceeding and order in Kohn v. American Metal Climax, Inc., 458 F.2d 255 (3d Cir.), cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972), to which the Opinion Sur Denial of Petition for Rehearing refers, gives no indication that the issues discussed in this dissent were ever considered or urged in connection with that order. Moreover, it is impossible to judge the context in which that unreported and thus non- precedential order, which was collateral to the reported proceedings in Kohn, was entered, or indeed, whether time restrictions were even at issue. Thus, that order, independent of any reasoned and published opinion, can scarcely constitute authority for this court to impose deadlines on district court judges.
 
 
 [9]
 The Judicial Council Reform and Judicial Conduct and Disability Act of 1980, Pub.L.No.96-458 which reflects, in its provisions the furthest extent to which Congress has gone in evidencing concern with judicial conduct, does not bear upon the instant situation
 
 
 [10]
 Kennecott Corp. v. Smith, 637 F.2d 181 (3d Cir. 1980)