**UNITED STATES GOLF ASSOCIATION,**
Appellant,

v.

**ST. ANDREWS SYSTEMS, DATA-MAX, INC., Appellee.**

No. 83–5629.

United States Court of Appeals, Third Circuit.

Argued April 10, 1984.

Decided Nov. 28, 1984.

Morrill J. Cole, Cole, Schotz, Bernstein, Meisel & Forman, P.A., Rochelle Park, N.J., Lee N. Abrams (Argued), Mayer, Brown & Platt, Chicago, Ill., Stephen M. Trattner (Argued), Washington, D.C., for appellant.

Byard G. Nilsson, Harold E. Wurst (Argued), Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst, Los Angeles, Cal., John G. Gilfillan, III, Franklyn C. Steinberg, III, Carella, Byrne, Bain & Gilfillan, Newark, N.J., for appellee.

Before ADAMS, BECKER, Circuit Judges and VAN DUSEN, Senior Circuit Judge.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal presents two interesting questions in the law of intellectual property. It arises from a lawsuit brought by appellant, the United States Golf Association ("U.S.G.A."), the governing body of amateur golf in the United States. The U.S.G.A. has developed a system for deriving the "handicaps" of amateur golfers, the core of which is a mathematical formula. Appellee Data-Max, Inc., d/b/a St. Andrews Systems, markets small computers that are programmed to calculate a golfer's handicap based on the U.S.G.A. formula. The U.S.G.A. brought this suit to enjoin Data-Max from using its formula as the basis for its computerized handicap system.

The U.S.G.A. bases its claim for an injunction on two theories. The first is that the use of the U.S.G.A. formula by Data-Max amounts to a "false designation of origin," and thus violates both section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the New Jersey common law against unfair competition. The second theory is that the use of the formula is a "misappropriation" under the doctrine of *International News Service v. Associated Press*, 248 U.S. 215 (1918), as that doctrine has been adopted by New Jersey. The district court granted partial summary judgment to Data-Max, holding that the use of the U.S.G.A. handicap formula by Data-Max did not violate a cognizable interest of the U.S.G.A. and thus could not be enjoined. The court then entered a final judgment on that claim under Fed.R.Civ.P. 54(b).

We conclude that the U.S.G.A. handicap formula is "functional," and thus that the U.S.G.A. cannot enjoin the use of the formula either under section 43(a) of the Lanham Act or under state law on the basis of any association in the public mind between the formula and the U.S.G.A. We also conclude that the U.S.G.A.'s claim does not fall within the "misappropriation" doctrine as it has been adopted by the State of New Jersey, largely because in using the formula Data-Max will not compete directly with

the U.S.G.A., and thus will not interfere with the economic incentives of the U.S. G.A. to maintain and update its handicap formula. Accordingly, we affirm the judgment of the district court.

## I. FACTS AND PROCEDURAL HISTORY

The U.S.G.A. has been the governing body of amateur golf in the United States since 1894. It seeks to promote the game of golf by numerous means, including the establishment of rules and regulations for play, the promotion of amateur tournaments, and the regulation of its member golf clubs. Among the services that the U.S.G.A. provides to amateur golfers is a "handicap" formula that allows golfers of different skill levels to compete with each other on an equal basis. The U.S.G.A. handicap system takes account of the difficulty of the course on which a round is played and provides "safeguards" against the inflation of handicaps by excluding particularly bad holes and by counting only the best ten of a golfer's last twenty rounds.[1]

The U.S.G.A. has developed the handicap formula over a period of eighty years. The first version of the system was published in 1897. A system based on a golfer's best three scores, first devised in 1904, was adopted by the U.S.G.A. in 1911. In later years, the basic formula was altered by the addition of several features: a "course rating system" and "net score" (score adjusted for course difficulty) method of handicapping; a "current ability" approach, in which only a golfer's most recent scores are counted; a system of "equitable stroke control" which disallows very high scores for individual holes; an upper limit on handicaps; and a "discounting" approach, in which a handicap is calculated based on a percentage, currently 96%, of the differentials between the player's score and the course difficulty. A single, nationwide system was prescribed by the U.S.G.A. in 1958. The most recent change of significance took place on January 1, 1976.

Data-Max was incorporated in 1980 for the purpose of providing golfers, primarily those who do not belong to U.S.G.A.-member clubs, with "instant handicaps." A computer program to calculate a handicap based on the U.S.G.A. formula is central to the products and services that Data-Max offers. Data-Max has sold or leased its computer to U.S.G.A.-member golf clubs, which use the computer in calculating handicaps.[2] Data-Max also markets a subscription telephone handicap service, which enables a golfer to call in a new score and immediately receive an updated handicap, and a computer that enables a golfer to directly enter a new score and receive an updated handicap.[3]

The U.S.G.A. filed a three count complaint in the United States District Court for the District of New Jersey, seeking relief for service mark infringement under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.;* for service mark infringement, unfair com-

---

1. The U.S.G.A. brief outlines the critical elements of the U.S.G.A. handicap formula:
 The U.S.G.A. Handicap Formula uses a golfer's ten best adjusted scores out of his most recent twenty adjusted scores.* The U.S.G.A. Handicap Formula also reflects the difficulty of the golf course on which each score was achieved. The Formula averages the lowest ten handicap "differentials" ** among the golfer's last twenty scores, multiplies the total by 96 percent, and then rounds off to the nearest whole number.
 * A golfer's adjusted score reflects certain adjustments which are designed to eliminate aberrations caused by an unusually high score on a single hole.
 ** A differential represents the difference between a golfer's adjusted score and the course rating of the golf course on which the golfer achieved that score.

2. The U.S.G.A. has no objection to this aspect of Data-Max's business, since the handicap is ultimately provided by a member golf club. The U.S.G.A. objects to an unauthorized organization, such as Data-Max, providing handicaps derived by means of the U.S.G.A. formula directly to golfers.

3. This service operates on the same principle as electronic teller machines: a golfer puts his or her plastic "score card" into the machine and types in the new score. The machine then tells the golfer the new handicap.

petition, and misappropriation under the common law of New Jersey; and for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[4] Data-Max responded with a seven-count counterclaim. The two primary counterclaims sought declaratory judgments on the two critical issues in the case: Data-Max's right to use the U.S.G.A. formula in providing handicaps, and its right to advertise that use.

 The district court considered these issues on Data-Max's motion for summary judgment on the counterclaims. The district court granted the motion on the first counterclaim mentioned above. The court held that the U.S.G.A. formula was not a "salable product," and thus not subject to "misappropriation" under the doctrine of *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), as adopted by the courts of New Jersey, and that, because the formula was "functional," it was not subject to protection under either federal or state

law as a service mark. The court denied the summary judgment motion on the second counterclaim, holding that material issues of fact existed as to the "likelihood of confusion" if Data-Max continued to advertise that its handicaps were calculated by use of the U.S.G.A. formula. Having granted summary judgment on the first counterclaim, the court then entered a final judgment as to that claim under Rule 54(b). The U.S.G.A. appeals from that judgment.[5]

## II. DISCUSSION

### A. Contentions of the Parties

The U.S.G.A. advances two distinct legal theories to support its claim to an injunction. The first, which can be broadly characterized as "false designation of origin," is based on a branch of the law of unfair competition closely related to trademark law. The U.S.G.A. asserts that Data-Max, by using the U.S.G.A. formula, is misleading the golfing public into thinking that the

---

**4.** The original complaint, filed May 17, 1982, was superseded by an amended complaint, filed September 7, 1982, which raised the same three claims.

**5.** Preliminarily, we address the question of our jurisdiction. Although neither party challenges our jurisdiction, it may be raised *sua sponte*. *See Hoots v. Pennsylvania*, 639 F.2d 972, 978 (3d Cir.), *cert. denied Swissvale Area School Dist. v. Hoots*, 452 U.S. 963, 101 S.Ct. 3113, 69 L.Ed.2d 974 (1981). Jurisdiction is invoked under 28 U.S.C. § 1291, which allows us to review "final decisions" of the district courts. In this case, the district court entered a final judgment pursuant to Fed.R.Civ.P. 54(b) on the first counterclaim, in which Data-Max requested a declaratory judgment that it was entitled to use (as opposed to advertise that it was using) the U.S.G.A. formula. The district court's resolution of the issue on appeal is clearly final, since the legal question presented by the first counterclaim has been conclusively decided in favor of Data-Max. In order for the entry of final judgment to be proper, however, the issue presented by the first counterclaim must also be legally and factually separable from the remaining claims. *See Morrison-Knudsen Co., Inc. v. Archer*, 655 F.2d 962, 965–66 (9th Cir.1981). The legal issues before us on this appeal are the applicability of the misappropriation doctrine to the use of the U.S.G.A. formula by Data-Max, and the "functionality" of the U.S.G.A. formula. These issues raise differ-

ent factual questions from the remaining issues in the case, which turn on the question whether Data-Max's advertisements would be likely to mislead golfers into believing that the U.S.G.A. endorsed its products. As noted below, that question is irrelevant to this appeal.

In *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980), the Supreme Court reemphasized the discretion of the district court to enter final judgment under rule 54(b), whenever the underlying decision is final and sufficiently separable from the other claims in the litigation. The Court specifically stated that considerations of judicial economy were proper considerations in exercising this discretion. 446 U.S. at 8, 100 S.Ct. at 1465. In this case, resolution of the questions currently on appeal will, as the district court found, promote judicial economy for two reasons. First, it will clarify the issues for (possible) trial. Second, it will insure that a trial on the remaining issues will not have to be set aside on the basis of any error in the district court's decision granting summary judgment on the issues currently before us. Resolution of the issues will also enhance the prospects for settlement, since the record suggests that the parties are not far apart on the remaining points. *See Curtiss-Wright Corp.*, 446 U.S. at 8 n. 2, 100 S.Ct. at 1465 n. 2. Because we cannot conclude that the district court abused its discretion when it entered a final judgment on the first counterclaim, we may properly entertain this appeal.

U.S.G.A. endorses Data-Max's products and services. The second theory is "misappropriation." The U.S.G.A. argues that it has invested time, effort, and money in the creation of the formula, and therefore is entitled to protection against Data-Max's using the formula as the basis of its own products and services. As we have noted, the district court rejected both of the U.S.G.A.'s theories.

On appeal, the U.S.G.A. argues that the district court erred in both its conclusions. On the first theory, the U.S.G.A. argues that, on summary judgment, the district court was obligated to presume that the public associated the formula with the U.S.G.A., since the evidence would support such a conclusion. In addressing the district court's conclusion that the formula was functional, the U.S.G.A. argues that "even though a product or feature performs a function (*i.e.,* is useful), it can nevertheless acquire secondary meaning," and that other handicap formulas could easily be devised. From these two premises, the U.S.G.A. argues that the "functionality" doctrine was inapplicable. Alternatively, the U.S.G.A. argues that "the functionality doctrine ... covers only matters of physical or visual design." On the misappropriation theory, the U.S.G.A. argues that the district court erred in concluding that the formula was not a "salable product," that it is undisputed that Data-Max used the U.S.G.A.'s formula without alteration, and that the misappropriation doctrine protects the "inventor" of a product or service from competition from a rival who merely takes that product or service and sells it as its own. U.S.G.A. also asserts that the fact that the formula was in the "public domain" is irrelevant to the applicability of the misappropriation doctrine.

In response, Data-Max raises two basic arguments with respect to the false designation of origin question. The first is that the formula can have no secondary meaning because it is neither "an object in commerce" nor an "identification for an object in commerce." Their second point is that the "use of the formula to compute does not exhibit it, and therefore [the formula] *could not be a designation of origin,*" (emphasis in original) and hence could not be a *false* designation of origin. On the misappropriation question, Data-Max makes three points. First, it argues that any use of the misappropriation doctrine to effect "the monopolization of an arithmetic formula" is preempted by the exclusion of such formulas from the federal patent statutes. Second, Data-Max argues that, since the formula is "functional," it cannot acquire secondary meaning, and thus may not be misappropriated. Third, Data-Max argues that the efforts of the U.S.G.A. to publicize the formula over the years have made the formula part of the public domain, and thus not "salable."

Although we reach the result advocated by Data-Max, our reasoning differs substantially from that advanced by the parties. On the false designation of origin point, our reasoning parallels that of the district court. On the misappropriation question, our analysis proceeds from the policies that define the scope of the misappropriation doctrine rather than from a focus on the "salability" of the formula or on any of the arguments offered in the briefs. We take these matters up in turn.

### B. *The "False Designation of Origin" Claim*

Under both New Jersey law and federal law, the functional aspects of a product or service may not be protected under trademark law, or under the related unfair competition doctrines based on possible confusion as to the source of origin of the products or services. *See Keene Corp. v. Paraflex Industries, Inc.,* 653 F.2d 822, 824 (3d Cir.1981); *SK & F, Co. v. Premo Pharmaceutical Laboratories, Inc.,* 625 F.2d 1055, 1064–65 (3d Cir.1980).[6] This

---

6. The New Jersey and Lanham Act requirements for a finding of unfair competition are substantively similar. *See SK & F Co.,* 625 F.2d at 1065–66. To establish "unprivileged imitation" of a competitor's product, under either the Lanham Act or New Jersey law, a plaintiff must establish both "non-functionality" and "secondary meaning." *Id.* at 1063 (New Jersey law)

rule reflects a balancing of divergent social interests. The use of "non-functional" features of a product or service to identify its source is legally protected against imitation by competitors, because the value of such features in identifying the source of the goods or services outweighs the social interest in allowing competitors to copy them. Functional features, on the other hand, may not be legally protected methods of identification, regardless of their association with the original manufacturer, because their usefulness in identifying the source of the product or service is outweighed by the social interest in competition and improvements, which are advanced by giving competitors free access to those features.

The "functionality" of a feature of a product or service cannot be determined by the application of a mechanical test. Although various forms of the inquiry have been articulated,[7] the essence of the question is whether a particular feature of a product or service is substantially related to its value *as a product or service, i.e.*, if the feature is part of the "function" served, or whether the primary value of a particular feature is the identification of the provider. *See In re Morton-Norwich*

(citing *Squeezit Corp. v. Plastic Dispensers, Inc.*, 31 N.J.Super. 217, 221–22, 106 A.2d 322, 325 (App.Div.1954); *id.* at 1065 (federal law) (citing *In re Mogen David Wine Corp.*, 328 F.2d 925, 929 (C.C.P.A.1964)).

A preliminary requirement of § 43(a) of the Lanham Act is that plaintiff establish a likelihood of damages. *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir.1980); *Ames Publ. Co. v. Walker-Davis Publ.*, 372 F.Supp. 1, 13 (E.D.Pa.1974). There must be "more than a mere subjective belief" that the plaintiff is likely to be harmed. *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 316–17 (2d Cir.1982). It is not clear on the record developed thus far whether the handicap formula at issue had any commercial value for the U.S.G.A., and therefore, whether U.S.G.A. is likely to be injured by defendant's use of the formula. However, since none of the parties raised this issue at trial or on appeal, we will not hinge our result on this requirement. At all events, it has not been suggested that the U.S.G.A.'s interest in its formula is insufficient to create a "case or controversy" within the meaning of Article III.

7. Section 742 of the Restatement of Torts provides the most commonly cited definition of functionality. That section defines functionality as follows:

A feature of goods is functional, under the rule stated in § 741, if it affects their purpose, action or performance, or the facility or economy of processing, handling or using them; it is non-functional if it does not have any of such effects.

Comment a further elaborates on that definition:

a. A feature of goods, or of their wrappers or containers, may be functional because it contributes to efficiency or economy in manufacturing them or in handling them through the marketing process. It may be functional, also, because it contributes to their utility, to their durability or to the effectiveness or ease with which they serve their function or are handled by users. When goods are bought largely for their aesthetic value, their features may be functional because they definitely contribute to that value and thus aid the performance of an object for which the goods are intended. Thus, the shape of a bottle or other container may be functional though a different bottle or container may hold the goods equally well. A candy box in the shape of a heart may be functional, because of its significance as a gift to a beloved one, while a box of a different shape or the form in which a ribbon is tied around the box may not be functional. Or a distinctive printing type face may be functional though the print from a different type may be read equally well. The determination of whether or not such features are functional depends upon the question of fact whether prohibition of imitation by others will deprive the others of something which will substantially hinder them in competition.

A feature is non-functional if, when omitted, nothing of substantial value in the goods is lost. A feature which merely associates goods with a particular source may be, like a trade-mark or trade name, a substantial factor in increasing the marketability of the goods. But if that is the entire significance of the feature, it is non-functional; for its value then lies only in the demand for goods associated with a particular source rather than for goods of a particular design.

As to the significance of the distinction between functional and non-functional features, *see* § 741, Comment j.

The Restatement (Second) of Torts did not deal with these questions, because its drafters felt that this area had become a separate area of law. Courts continue to cite the First Restatement on the definition of functionality. *E.g., In re Hollaender Mfg. Co.*, 511 F.2d 1186 (C.C.P.A. 1975). *See also* 4A R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies, § 25.29 n. 11 (4th ed. 1983).

*Products, Inc.,* 671 F.2d 1332, 1337–40 (C.C.P.A.1982); Restatement of Torts § 742 comment a (1938). Several courts have noted that the key policy served by barring the use of functional features for identification is the policy favoring competition, and that the "functionality" inquiry must be addressed in light of this policy. *See Morton-Norwich Products,* 671 F.2d at 1339; *Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1218 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *Fotomat Corp. v. Cochran,* 437 F.Supp. 1231, 1235 (D.Kan. 1977).

■ The question of the "functionality" of the U.S.G.A. formula is not difficult. Its simple mathematical formula is the basic tool for deriving a handicap from a golfer's raw scores; as such, the formula is central to the "function" performed by the Data-Max products and services. The U.S. G.A., relying on *Ideal Toy Corp. v. Plawner Toy Manufacturing Corp.,* 685 F.2d 78 (3d Cir.1982), argues that the availability of numerous alternative methods of designing a particular feature of a product or service defeats the functionality of any single method. This argument proceeds from an overly broad reading of *Plawner.* Although other formulas could be developed to serve the function of handicapping golfers, a particular method of serving that function may be superior to others. The feature at issue in *Plawner,* the color scheme of the Rubik's Cube, was held to be non-functional because the choice of colors was essentially arbitrary. If another aspect of the cube had been in issue, for instance, the internal design or the number of squares per side, a different result would probably have been reached. The manufacturer could not have asserted that these features were "non-functional" simply on the ground that other designs were conceivable because granting a monopoly over the "best" design of those features would have effectively excluded competi-

tion for the basic product—six-sided puzzles requiring that nine independent panels on each side be aligned in a single particular configuration.

When products or services of different providers are close substitutes for one another, the development of "industry standards" for certain aspects of the products or services will benefit consumers by facilitating comparability between and interchangeability among alternative products. The fact that any number of standards may be feasible and useful does not mean that the preferred standard is not "functional," since use of that standard promotes comparability and interchangeability. The U.S. G.A. formula is like an "industry standard": it allows the handicaps calculated by different providers to be compared with one another, much as the standard gauge of railroad track allows a locomotive of one company to run on the track of another. Allowing one provider to obtain exclusive rights in such a standard would enable it to exclude competitors desiring to provide the same product or service, particularly if the original provider, such as the U.S.G.A. in this case, starts with a virtual monopoly. To allow a monopoly over such a standard would defeat the policy of fostering competition that underlies the functionality doctrine.

The U.S.G.A. has raised no factual issues that would call into question a conclusion that the formula is "functional." Accordingly, we hold that the district court's entry of summary judgment on this aspect of the U.S.G.A.'s claim was appropriate.

### C. *The Misappropriation Claim*

■ The doctrine of "misappropriation," which is a distinct branch of the law of unfair competition, originated with the Supreme Court's decision in *International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) ("*I.N.S.*").[8] The doctrine has been applied

---

**8.** One pre-*I.N.S.* case in federal court upheld a misappropriation claim, relying on the same factors as the *I.N.S.* Court. *National Telegraph*

*News Co. v. Western Union Telegraph Co.,* 119 Fed. 294 (7th Cir.1902) (rival company rebroad-

to a variety of situations in which the courts have sensed that one party was dealing "unfairly" with another, but which were not covered by the three established statutory systems protecting intellectual property: copyright, patent, and trademark/deception as to origin.[9] The doctrine has also been the subject of considerable scholarly attention.[10] Application of the misappropriation doctrine requires courts to contend with the basic problem of the law of intellectual property: balancing the rights of the creator of ideas or information to exploit them for commercial gain against the public's right to free access to those ideas.[11] Concomitantly, the dilemma posed by the doctrine can best be viewed as an attempt to provide the necessary incentives to the creators of intellectual property without unnecessarily restricting the public's free access to information.[12] The *I.N.S.* case illustrates the problem.

I.N.S., which was barred for political reasons by British censors from cabling its reports of the First World War to the United States, provided war coverage to the readers of its papers by buying early editions of A.P. papers and either copying or paraphrasing the A.P. reports in its own later editions. A.P. objected to this use of its stories, even though the stories were not copyrighted and even though A.P. had no protectible interest in the underlying facts it was reporting. The Court came down on the side of protecting A.P.'s investment of "labor, skill, and money" in reporting the news, against I.N.S.'s right to take that information and use it in direct competition with A.P. The Court noted that without such protection, A.P. would have little incentive to invest in newsgathering.

The language of the *I.N.S.* opinion is very broad, and courts have struggled over

casts Western Union's stock price quotations over its own telegraph network).

9. The broadest statements have gone so far as to say that any "unfair" use of an idea created by another is misappropriation. *E.g., Board of Trade v. Dow Jones & Co.,* 108 Ill.App.3d 681, 697, 64 Ill.Dec. 275, 286, 439 N.E.2d 526, 537 (1982), *aff'd,* 98 Ill.2d 109, 74 Ill.Dec. 582, 456 N.E.2d 84 (1983); *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.,* 199 Misc. 786, 796, 101 N.Y.S.2d 483, 492 (1950), *aff'd.* 279 A.D. 632, 107 N.Y.S.2d 795 (1951). *See also* R. Callmann, *supra* note 7, at § 237. As noted below, the majority of courts has applied the doctrine more narrowly, as we do here.

10. *E.g.,* Baird, *Common Law Intellectual Property and the Legacy of* International News Service v. Associated Press, 50 U.Chi.L.Rev. 411 (1983); Rahl, *The Right to "Appropriate" Trade Values,* 23 Ohio St.L.J. 56 (1962); Note, *The "Copying-Misappropriation" Distinction: A False Step in the Development of the* Sears-Compco *Pre-Emption Doctrine,* 71 Colum.L.Rev. 1444 (1971); *Developments of the Law: Competitive Torts,* 77 Harv.L.Rev. 888 (1964).

11. The three statutory schemes of intellectual property law deal with this basic problem differently. Patent law preserves to the inventor the exclusive right to commercial exploitation of the invention for a limited period of time, currently 17 years. 35 U.S.C. § 154. Copyright law preserves to an author the right to commercially exploit his or her works for a longer period of time; for works created on or after

January 1, 1978, the period is the lifetime of the author plus fifty years. 17 U.S.C. § 302(a). Substantive ideas, however, cannot be copyrighted; copyright attaches only to the form of the work. 17 U.S.C. § 102(b). Trademark law allows a business to use a mark or name to identify its products, but limits the type of mark or name which can be appropriated for that purpose. The law of false designation of origin discussed above is an offshoot of trademark law. *See* 15 U.S.C. § 1125(a). The doctrine of functionality, discussed in part II.B, limits the type of feature that can be protected for purposes of identification.

12. The dilemma can also be framed in terms of balancing the natural right of a producer in the fruits of his or her labor against the public's access right. *See* Baird, *supra* note 10. The constitutional provision authorizing copyrights and patents, and the statutes implementing it, are based on the "incentive" theory, in contrast to continental systems that are based on a "natural rights" theory. *I.N.S.,* however, explicitly recognized that the creator's interest is rooted in the "labor, skill and money" which has been devoted to the creation. Professor Baird believes there is little practical difference between relying on the "incentive" theory and relying on the "natural rights" theory. Baird, *supra* note 10, at 420–21. In our view, using the incentive theory to define the limits of misappropriation is more appropriate, since it is based on a "social" interest (incentives for creation) which can be balanced against another social interest (free access), while the natural rights theory requires a balancing of incommensurables.

the years to define the limits of the doctrine. The Second Circuit, under the leadership of Judge Learned Hand, sought to limit *I.N.S.* to its facts, because of the broad implications of the doctrine for limiting the use of copying in commercial competition. *See Cheney Brothers v. Doris Silk Corp.*, 35 F.2d 279 (2d Cir.1929) (dress designs not covered by *I.N.S.*), *cert. denied*, 281 U.S. 728, 50 S.Ct. 245, 74 L.Ed. 1145 (1930); *Millinery Creators' Guild, Inc. v. Federal Trade Commission*, 109 F.2d 175 (2d cir.1940) (design of high-priced hats), *aff'd*, 312 U.S. 469, 61 S.Ct. 708, 85 L.Ed. 955 (1941); *RCA Manufacturing Co. v. Whiteman*, 114 F.2d 86 (2d Cir.) (rebroadcast of recordings), *cert. denied*, 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463 (1940) (cases cited in chronological order). The doctrine survived, however, in the context of factual situations very close to that of *I.N.S. E.g., Associated Press v. KVOS, Inc.*, 80 F.2d 575 (9th Cir.1935) (radio broadcast of news taken from A.P. newspaper).

After the Supreme Court's decision in *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1939), misappropriation became a question of state, rather than federal law. Although the *I.N.S.* doctrine was rejected by two federal courts interpreting the law of the state in which they were sitting, *Addressograph-Multigraph Corp. v. American Expansion Bolt & Manufacturing Co.*, 124 F.2d 706 (7th Cir.1941) (Illinois law), *cert. denied*, 316 U.S. 682, 62 S.Ct. 1270, 86 L.Ed. 1755 (1942); *Triangle Publications v. New England Newspaper Publishing Co.*, 46 F.Supp. 198 (D.Mass.1942) (Massachusetts law), some state courts took a more expansive view of the scope of the misappropria-

tion doctrine in the post-*Erie* era. *E.g. Metropolitan Opera Association v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483 (1950), *aff'd*, 279 A.D. 632, 107 N.Y.S.2d 795 (1951).[13]

A federal aspect to the problem of the scope of the misappropriation doctrine was reintroduced by the Supreme Court's decisions in *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). The Court held that the decision by Congress to exclude certain types of intellectual property from protection under the patent and copyright laws was a policy decision that the societal interest in free access to those ideas outweighed the need to provide incentives for their production, and that state law doctrines which protected such intellectual property were preempted by that policy decision. Subsequent decisions of the Supreme Court have made clear, however, that the misappropriation doctrine has not been completely eviscerated. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974); *Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973).[14] The Court has not rejected the *Sears-Compco* doctrine, nor has it clearly defined where the power of the states to protect interests in intellectual property ends, and where the realm of federal preemption begins. The problem before us, therefore, is to apply the misappropriation doctrine as we believe the New Jersey courts would apply it, in light of the limitations which we believe federal preemption places on the permissible scope of state-law protection for intellectual property.[15]

---

**13.** The Second Circuit subsequently held, over Judge Hand's dissent, that *Metropolitan Opera* overruled its prior decision in *RCA Mfg. Co. v. Whiteman. See Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657 (2d Cir.1955).

**14.** On the basis of these cases, we reject DataMax's contention that the protection claimed by the U.S.G.A. is barred by the *Sears-Compco* doctrine.

**15.** New Jersey has adopted the misappropriation doctrine. *See Columbia Broadcasting System, Inc. v. Melody Recordings, Inc.*, 134 N.J.Super. 368, 341 A.2d 348 (App.Div.1975). The New Jersey Supreme Court, however, has not spoken on any of the specific issues presented by this case; accordingly, our analysis is based on a prediction that that court would adopt the misappropriation doctrine as it has been developed by the state and federal courts over the years,

Two recent cases have grappled with these problems in a context analagous to this case. In *Board of Trade v. Dow Jones & Co.*, 98 Ill.2d 109, 74 Ill.Dec. 582, 456 N.E.2d 84 (1983), the Illinois Supreme Court upheld an injunction that barred the Chicago Board of Trade (the "CBT") from creating a stock index future contract based on the Dow Jones Industrial Average. The court based its decision on a number of factors: the fact that a significant part of the value of using the Dow Jones average is the association with Dow Jones; that "there are an infinite number of stock market indexes which could be devised" and that the CBT would be encouraged to develop a new index if it could not use Dow Jones's; and that, although Dow Jones was not licensing anyone to use its index as the basis for a stock index future at the time the CBT sought to use it, Dow Jones was entitled to protection against "misappropriation" of the index for that use. Justice Simon, joined by two of his colleagues, dissented. The dissent concentrated on the absence of "direct competition"—competition between the creator and copier in the creator's primary market—and argued that the majority's result "broadly expanded the tort of misappropriation in Illinois." 98 Ill.2d at 124, 74 Ill. Dec. at 589, 456 N.E.2d at 91.

In *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704 (2d Cir.1982), the Second Circuit, applying New York law, upheld a preliminary injunction against the Commodities Exchange ("Comex"), which was using the Standard & Poor's 500 ("S&P 500") as the basis of its stock index futures contract. In *Standard & Poor's,* the court relied on the "expenditure of time and money" in creating the index, and the competition between Comex and the Chicago Mercantile Exchange, which Standard & Poor's had licensed to create a stock market index future based on the S&P 500. Judges Newman and Knapp concurred in sustaining the preliminary injunction, deferring to the district court's analysis of the "public interest" considerations in maintaining the status quo pending trial, but declined to address the "different, novel and close" legal questions posed by Comex's use of the S&P 500 in competition with a licensee of Standard & Poor's.[16]

This case is similar to the stock market index cases in a number of significant respects. As in the stock market index cases, the plaintiff here is seeking to exclude a rival from using a formula it has derived for commercial gain. The formulas in all three cases serve useful functions—in the stock market cases, the index is designed to track the general movement of the stock market; in this case, the formula is designed to indicate a golfer's level of competence. None of these formulas, however, is unique to its function. As a result of their creators' efforts, the respective formulas are generally accepted by the public as reliable means of performing their respective functions. Although the plaintiffs spend some time and effort updating their formulas, and also compute results by means of their formulas, the primary value of the results produced are not their inherent value in performing the underlying functions, but rather in the fact that they enable the public to discuss the underlying matters (*i.e.*, the direction of the stock market or the ability of golfers) by means of a common set of terms.

In determining whether the misappropriation doctrine should be applied in this case, however, we must keep in mind the basic policies that underlie the doctrine and its limits. In *I.N.S.*, the Court based its conclusion in substantial part on the fact

based on the considerations we outline in this opinion.

**16.** In *Standard & Poor's,* the Second Circuit applied a lenient standard for the granting of a preliminary injunction. The court found (1) that S&P's misappropriation claim presented "sufficiently serious questions going to the mer-

its to make them a fair ground for litigation." (2) that the district court "did not err in finding that the balance of hardships tips decidedly toward S&P," and (3) that given the balance of hardships and the "significant risk of irreparable harm to the public," S&P had met the irreparable harm requirement. 683 F.2d at 711.

that I.N.S. was using information which A.P. had developed in direct competition with A.P. in its primary market, the sale of newspapers. I.N.S.'s activity, if not checked, could have destroyed A.P.'s incentive to create the information involved, and this would not only have harmed A.P. but also would have left the public without the information. If, on the other hand, I.N.S. had used the information in a different manner—for instance, in writing a story on American correspondents covering the war—the use of A.P.'s information would not have affected A.P.'s incentive to gather the information. Although A.P. might have been better off if it had exclusive rights to such derivative uses of its information, providing legal protection might also harm the public, since A.P. might never have produced the story about correspondents covering the war. Indirect competition of this sort—use of information in competition with the creator outside of its primary market—falls outside the scope of the misappropriation doctrine, since the public interest in free access outweighs the public interest in providing an additional incentive to the creator or gatherer of information.

The competition in this case is indirect. The U.S.G.A. is not in the business of selling handicaps to golfers, but is primarily interested in the promotion of the game of golf, and in its own position as the governing body of amateur golf. The handicap formula was developed to further these two goals. A member of a golf club who obtains his handicap through his club does not pay for that service, and the U.S.G.A. is not directly affected by the number of official handicaps the clubs calculate each year or by the number of golfers who obtain handicaps. Data-Max, on the other hand, is in the business of providing "instant handicaps" to golfers, either by selling or leasing its computers to golf clubs, or by providing handicaps directly to golfers who cannot obtain "instant handicaps" through their clubs. The U.S.G.A. does not object to the sale or lease of Data-Max's computers, and does not attempt to provide the direct services which Data-Max provides to golfers. Thus, it is inconceivable that Data-Max's business will interfere with the U.S.G.A.'s incentive to maintain or update the handicap formula.

The absence of direct competition with the producer's primary use of the information was not viewed as dispositive by either the Illinois Supreme Court in *Dow Jones* or the Second Circuit in *Standard & Poor's.* The court in *Dow Jones* concluded that direct competition was unnecessary, and the court in *Standard & Poor's* found "direct competition" between S&P and Comex, even though the competition was outside S&P's primary market. Neither of these cases makes a persuasive argument for dispensing with the "direct competition" requirement.[17] Since direct competition

17. In determining that direct competition was unnecessary to a finding of misappropriation, the Illinois Supreme Court stated that "it appears unlikely that an adverse decision will cause [Dow Jones] to cease to produce its averages or that the revenue it currently receives for the distribution of those averages will be materially affected." 98 Ill.2d at 119–20, 74 Ill.Dec. at 587, 456 N.E.2d at 89. Since the Supreme Court in I.N.S. relied in substantial part on the fact that I.N.S.'s use of the A.P. stories would impact on A.P.'s incentive to provide those stories, it is clear that the Illinois Supreme Court in *Dow Jones* relied on a different approach than the traditional, *I.N.S.*-type of misappropriation analysis.

It is by no means clear, however, what specific factor the Illinois court relied on to play the role traditionally played by direct competition. As we have noted above, the direct competition requirement protects the public interest in free access to information except where protection of the creator's interest is required in order to assure that the information is produced. The Illinois Supreme Court pointed to many factors in reaching its conclusion. One of the factors it relied on was the incentive which the court anticipated that its ruling would provide for the development of new stock market indices. This type of "incentive analysis" is significantly different from that employed in traditional *I.N.S.*-type misappropriation cases. It is possible for a court to look at the effect which a competitor's behavior will have on the incentive of the creator of information, and to balance the social interest in preserving the creator's incentive against the social interest in free access to the information created, provided that all the necessary facts are before the court. It is far more speculative, however, for a court to look to the

has generally been seen as necessary to a finding of misappropriation,[18] and since it properly balances the competing concerns of providing incentives to producers of information while protecting free access, we believe that New Jersey would require direct competition in a misappropriation case, absent a substantial justification for making an exception.[19]

A possible justification for dispensing with the direct competition requirement in this case, which was also present in *Dow Jones* and *Standard & Poor's*, is the fact that the information involved is so closely associated with the creator and has so little intrinsic value that the use of the information by the competitors is really an attempt to trade on the "good will" of the creator, and thus should be prohibited.[20] The fact that the U.S.G.A. formula, like those involved in the stock market cases, is only one of a potentially large number of possible approaches to the underlying problem (quantifying the ability of golfers to enable them to compete with (and bet with) other golfers on an equitable basis) reduces the cost to the public of recognizing proprietary rights in the formula.[21] The presence of so many alternatives also indicates that the primary value to Data-Max of using the U.S.G.A. formula is the public acceptance that the U.S.G.A. has built up for it over the years. This public acceptance could be characterized as part of the U.S.G.A.'s

effect its ruling will have on the incentives of competitors of the creator of information, some of whom will not be before the court. We believe that this court should not engage in such a speculative inquiry in this case.

The Second Circuit, in *Standard & Poor's*, did not address any of these questions. The court's consideration of the issues was limited by the procedural posture of the case: the appeal was not from a final judgment but rather from a preliminary injunction. The court explicitly disclaimed that it was reaching the merits of the misappropriation claim, and concluded only that "S&P's claim of misappropriation presents sufficiently serious questions going to the merits to make them a fair ground for litigation." 683 F.2d at 711. The court, without discussion, stated that because Comex's use of the S&P 500 was in competition with that of the Chicago Mercantile Exchange, which S&P had licensed, there was "direct competition." As we have framed the question, however, the competition involved in *Standard & Poor's* was indirect, because Comex's use of the S&P 500 was outside S&P's primary market for that information, and thus would not undercut S&P's incentive to produce its index. Given its conclusion that there was direct competition, however, the Second Circuit did not have to reach the question whether direct competition was necessary to a finding of misappropriation.

18. *See Dow Jones*, 98 Ill.2d at 124–25, 74 Ill.Dec. at 589, 456 N.E.2d at 91 (Simon, J., dissenting). *See also National Football League v. Governor of Del.*, 435 F.Supp. 1372 (D.Del.1977); *Intermountain Broad & T. Corp. v. Idaho Microwave, Inc.*, 196 F.Supp. 315, 325–26 (S.D.Idaho 1961); Rahl, *supra* note 10, at 63–69 (analyzing decisions in light of "frustration of primary purpose doctrine"—another name for the direct competition requirement). Both *I.N.S.* itself and the one New Jersey case cited to us explicitly adopting *I.N.S.*, *Columbia Broadcasting System, Inc. v. Melody Recordings, Inc.*, 134 N.J.Super. 368, 341 A.2d 348 (App.Div.1975), involved direct competition.

19. As we have noted, the only New Jersey case cited to us involved direct competition. *Columbia Broadcasting System, Inc. v. Melody Recordings, Inc.*, 134 N.J.Super. 368, 341 A.2d 348 (App. Div.1975) (record pirating). Other than this fact, we have no particular guidance on the decision the New Jersey courts would make on this question. In this Circuit the federal courts in interpreting state law will look not only to binding precedent, but also to trends in lower state courts which indicate the direction of state law. *See W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.*, 746 F.2d 215 (3d Cir.1984); *Becker v. Interstate Properties*, 569 F.2d 1203 (3d Cir.1977). In this case, however, given the paucity of New Jersey authority, none which indicates how we should deal with the issues presented by this case, we are obligated to look to the authority from other jurisdictions, and the persuasiveness of that authority, and to determine which rule we believe the New Jersey Supreme Court would adopt. *See Keystone Aeronautics Corp. v. R.J. Enstrom Corp.*, 499 F.2d 146, 147 (3d Cir. 1974). *See also* C. Wright, The Law of the Federal Courts § 58, at 270–71.

20. Professor Baird has offered this explanation, as applied to the stock market index futures cases, as a better approach to these cases than the traditional *I.N.S.* analysis. *See* Baird, *supra* note 10, at 423–28.

21. This was one of many factors focused on by the Illinois Supreme Court in *Dow Jones*, 98 Ill.2d at 121, 74 Ill.Dec. at 588, 456 N.E.2d at 90.

"good will." [22] We must determine, therefore, whether the New Jersey courts would interpret the misappropriation doctrine in such a way as to dispense with the "direct competition" requirement on the facts of this case.

We conclude that, at least on the facts of this case, New Jersey would not dispense with the requirement of direct competition.[23] The public acceptance of the U.S.G.A.'s handicap formula stems from the golfing public's desire to have a uniform system of quantifying recent performances in a way that will allow equitable competition among golfers of differing abilities. The U.S.G.A., in furtherance of its role as the governing body of amateur golf, has provided such a system and, in the absence of a better system, the public has apparently accepted it. Under this state of affairs, the emergence of a single standard becomes largely a function of the need for uniformity. To require Data-Max to use a different formula would effectively destroy its ability to provide a handicapping service, since the U.S.G.A. formula is widely accepted by the golfing public. The purpose of a handicap is comparison between golfers, and handicaps based on different formulas cannot be readily compared.

Because the U.S.G.A. formula is the equivalent of an "industry standard" for the golfing public, preventing other handicap providers from using it would effectively give the U.S.G.A. a national monopoly on the golf handicapping business.[24] Where such a monopoly is unnecessary to protect the basic incentive for the produc-

---

**22.** This factor was also recognized by the Illinois Supreme Court in *Dow Jones*, 98 Ill.2d at 120–21, 74 Ill.Dec. at 587–88, 456 N.E.2d at 89–90.

**23.** We further note that expanding the misappropriation doctrine in such a way that it might give the creator of a particular idea or piece of information that has been made public a permanent monopoly over its commercial use could raise problems of preemption under the *Sears-Compco* doctrine. *See supra* notes 14–15 and accompanying text.

**24.** We note that this is a possible distinction of the stock market index cases. If a commodities exchange was to derive its own index, and if it could persuade a large enough group of investors that it performed the desired purpose better than any of the existing indices, the exchange could compete effectively with the Chicago Mercantile Exchange, which has the largest share of this business because it is licensed to use the S&P 500. There would be two obstacles to such a new index. First, since the availability of a deep and liquid market is probably more important to investors than the technical characteristics of the index which is the basis of the futures contract, a new index would probably have great difficulty competing with the CME. This same problem, however, would affect an exchange trying to set up a second market with a futures contract based on the S&P 500, and thus is extrinsic to the intellectual property question we are dealing with. Second, the Commodities Futures Trading Commission requires that such futures be based on an established index. Although this regulatory requirement might effectively give the established indices market power if they were granted the exclusive rights to use or license their own indices, we believe that this fact should have no impact on our analysis of the intellectual property questions involved in this case, but rather is a problem to be dealt with in the regulatory context.

Although, at first blush, the problem that Data-Max would face in persuading golfers to use a different handicapping formula is similar to the problem a rival exchange would face in persuading speculators to use a new index, there is a major difference which is relevant to the protection granted to the intellectual property involved. The exchange's problem is providing a deep and liquid market for its product. Theoretically, there is no reason why rival exchanges could not compete in this business, although as a practical matter the benefits of having a single market probably outweigh any gains which might result from the availability of competitive products on different exchanges. Data-Max's problem, on the other hand, is that golfers look to the U.S.G.A. formula to provide a method of comparing their ability with all other golfers in the United States. A single formula is necessary to accomplish this purpose. Data-Max's problem, therefore, does not arise solely from the need to persuade a large number of golfers to use its product instead of that of the U.S.G.A., but also from the golfing public's desire to have a single, uniform handicap system, which the U.S.G.A. has filled. The distinction makes a very major difference in the following sense: CBT or Comex will be on approximately the same footing in competing with CME (regulatory considerations aside), regardless of whether they use "established" indices or develop their own; Data-Max, on the other hand, will be out of business if it cannot use the U.S.G.A. formula, but clearly has had some success by using the U.S.G.A. formula.

tion of the idea or information involved, we do not believe that the creator's interest in its idea or information justifies such an extensive restraint on competition. This case provides a good example of why such a restraint would harm the golfing public. Data-Max has expended time and creative energy in devising its own products and services. It has not only created the program used to calculate handicaps by computer, but has devised a handicapping service which improves on that provided by the U.S.G.A., at least to the extent that Data-Max provides a golfer with a fresh handicap faster than the U.S.G.A. does. In addition, the U.S.G.A. has not been completely deprived of the opportunity to be compensated for its "good will" in connection with the handicap formula. To the extent that the approval of the U.S.G.A. would enhance the value of "instant handicaps," the U.S.G.A. has an opportunity, if it wishes to exercise it, of offering either Data-Max or other companies the use of the U.S.G.A. name in marketing its products and services.

### III. CONCLUSION

We hold that the U.S.G.A. has no legally protectible interest in its formula, and thus is not entitled to an injunction in this case. The U.S.G.A. formula is a functional aspect of its handicap system, and thus may not be protected as an identifying characteristic under either federal or New Jersey law. The false designation of origin claims are therefore legally insufficient. The "misappropriation" claim is also legally insufficient, because the use of the U.S.G.A. formula by Data-Max is not in direct competition with the U.S.G.A. We do not believe that New Jersey would dispense with the requirement of direct competition without a substantial reason, and we do not find such a reason on the facts of this case.

Accordingly, the judgment of the district court will be affirmed.